PONTIAC SCHOOL DISTRICT v MILLER, CANFIELD, PADDOCK &
STONE

Docket No. 180757. Submitted November 20, 1996, at Detroit. Decided
February 21, 1997, at 9:00 A.M. Leave to appeal sought.

The School District of the City of Pontiac brought an action in the
Oakland Circuit Court against Miller, Canfield, Paddock & Stone, a
copartnership, alleging legal malpractice in connection with a bond
issue of the school district. The plaintiff alleged three counts.
Count I alleged that the defendant's representative negligently
drafted the language of a ballot proposal pertaining to the bonds.
Count II alleged that the defendant's representative provided incor-
rect legal advance about the amount of state aid the plaintiff would
receive as a result of issuing the bonds and other actions. Count III
alleged damages resulting from an alleged conflict of interest that
occurred when the defendant represented both the plaintiff and the
lead underwriter of the bond issue. The jury returned a verdict for
the plaintiff with regard to all three counts and the trial court, John
J. McDonald, J., entered a judgment awarding the plaintiff present
and future damages. The court then denied the defendant's motion
for judgment notwithstanding the verdict, remittitur, or a new trial.
The defendant appealed and the plaintiff cross appealed.

The Court of Appeals *held*:

1. The trial court erred in denying the defendant's motion for
judgment notwithstanding the verdict with respect to count III. The
plaintiff failed to present substantial evidence from which the jury
could infer that the defendant's legal malpractice was a cause in
fact of the plaintiff's damages and failed to show that the defend-
ant's negligence was a proximate cause of the plaintiff's damages.
The defendant is entitled to a directed verdict with regard to count
III.

2. The trial court committed error requiring reversal in denying
the defendant's request that it give SJI2d 11.01, the standard jury
instruction for comparative negligence, with regard to counts I and
II. Comparative negligence is a defense in legal malpractice actions
based on negligence unless as a matter of law the client had no
obligation to act on the client's own behalf. There was sufficient
evidence for the jury to find comparative negligence on the part of

the plaintiff with respect to count I. A plaintiff may be found to be comparatively negligent for an omission in a document that an attorney has been hired to prepare. Comparative fault can be based on a plaintiff's failure to take reasonable measures that might have prevented or reduced the injury caused by the defendant's negligence.

3. The jury should have been instructed to assess the relative degree of fault of the plaintiff and the defendant with regard to count II. The fact that the defendant had a complete liability defense if the jury accepted the testimony of the defendant's agent that he provided correct legal advice with regard to the state aid formula did not preclude a comparative negligence jury instruction with regard to count II. The law does not require that the jury must view evidence of the plaintiff's negligence on an all-or-nothing basis.

4. Because of the trial court's failure to give the requested comparative negligence instruction for counts I and II, the matter must be reversed and remanded for a new trial with regard to those counts.

5. The trial court erred in giving SJI2d 53.03, which concerns reducing future damages to present value. SJI2d 53.03 was not applicable in this case. The defendant successfully rebutted the presumption for using the five percent simple interest rate provided in SJI2d 53.03 by presenting undisputed evidence that the present value of the plaintiff's future damages was determined by using actual market rates that are compounded. The error resulted in unfair prejudice to the defendant and requires reversal of counts I and II.

6. The trial court did not err in allowing the plaintiff to recover damages under count II for lost state aid budgeted for the 1991-92 school year as well as for unnecessary interest costs arising from the refunding of the plaintiff's outstanding 1985 bonds. The separate damage awards were not inconsistent or mutually exclusive.

Reversed with regard to all counts and remanded for a new trial with regard to counts I and II and for entry of a judgment notwithstanding the verdict for the defendant with regard to count III.

1. ATTORNEY AND CLIENT — MALPRACTICE — ELEMENTS OF MALPRACTICE ACTION — PROXIMATE CAUSE.

A plaintiff must prove the following elements to prevail in an action alleging legal malpractice: the existence of an attorney-client relationship, negligence in the legal representation of the plaintiff, that the negligence was a proximate cause of an injury, and the fact and extent of the injury alleged; the plaintiff, to prove proximate cause, must establish that the defendant's action was a cause in fact of the

claimed injury by introducing evidence that affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result.

2. NEGLIGENCE — COMPARATIVE NEGLIGENCE — LEGAL MALPRACTICE.

Comparative negligence is a defense in a legal malpractice action unless, as a matter of law, the client had no obligation to act on the client's own behalf; comparative fault can be based on the client's failure to take reasonable measures that might have prevented or reduced the injury caused by the attorney's negligence; a client may be found to be comparatively negligent with regard to an omission in a document that an attorney has been hired to prepare where the omitted language could have been noticed and is within the client's knowledge.

3. TRIAL — STANDARD JURY INSTRUCTIONS.

A trial court, merely because the evidence in a case may include the subject matter of a Standard Jury Instruction, need not automatically read every Standard Jury Instruction that might tangentially touch on the subject matter, even when requested by counsel to do so; it is for the trial court to determine when a standard instruction is applicable, not in an abstract or theoretical sense, but in the context of the particular case with due regard for the parties' theories of the case and counsel's legitimate desire to structure final argument in relation to anticipated jury instructions (MCR 2.516).

*Pollard & Albertson, P.C.* (by *Dennis R. Pollard* and *Neil H. Goodman*), for the plaintiff.

*Barris, Sott, Denn & Driker, P.L.L.C.* (by *Eugene Driker* and *Morley Witus*), and *Hill Lewis* (by *Robert B. Webster, Charles H. Polzin,* and *Kevin H. Breck*), for the defendant.

Before: TAYLOR, P.J., and HOOD and P. J. CLULO*, JJ.

TAYLOR, P.J. Following a jury trial, defendant appeals as of right, and plaintiff cross appeals, the judgment awarding plaintiff $3,933,249.40 in present

---

* Circuit judge, sitting on the Court of Appeals by assignment.

damages and $21,138,438 in future damages. We reverse and remand for a new trial.

I

This legal malpractice action arose in connection with a $54,665,074 bond issue. The bond issue was necessary to address plaintiff's accumulated deficit, its deteriorating physical facilities, inadequate supply of textbooks and equipment, and other assorted needs. In 1989 and 1990, plaintiff's then superintendent, Dr. LaBarbara Gragg, and her administrative staff, principally Paul Rothrock, then an assistant superintendent and plaintiff's chief financial officer and its "point person" on the bond issue until January 1991, raised the possibility of a substantial bond issue with plaintiff's financial advisor, Ronald G. Erickson, and plaintiff's bond counsel, George Stevenson, of the firm Miller, Canfield, Paddock & Stone (Miller Canfield). Dr. Gragg and Rothrock sought to determine plaintiff's borrowing potential without causing the taxpayers to pay more than 2.8 mills in taxes. At a meeting in September 1990, plaintiff's administrators estimated plaintiff's needs to be in the range of $80 million. Yet, on the basis of the 2.8 mill figure, Dr. Gragg and Rothrock estimated that plaintiff could only borrow between $53 and $55 million. Thereafter, as a result of discussions with Rothrock, Erickson set forth a proposal for a bond issue that estimated plaintiff's bonding capacity as $53.21 million without exceeding the 2.8-mill limitation.[1] Dr. Gragg, acting on

---

[1] According to Erickson's proposal, the bond issue would consist predominantly of capital appreciation bonds (CABS) rather than current interest bonds (CIBS). Unlike CIBS, on which interest is paid currently, CABS are essentially zero coupon bonds, on which interest is deferred, accumulating and compounding until the bonds mature. Under Erickson's analy-

Rothrock's recommendation, proposed that plaintiff's board of education seek voter approval of two ballot proposals requesting approximately $53 million.

Thereafter, at a meeting on December 10, 1990, plaintiff's board of education approved a resolution prepared by Stevenson seeking voter approval of two ballot proposals for $9.2 million in deficit reduction bonds to eliminate plaintiff's accumulated deficit and up to $48.45 million in bonds to fund various projects, such as remodeling buildings, replacing the bus depot, buying school buses and textbooks, improving athletic facilities and playgrounds, and refunding the 1985 bonds for asbestos removal. On February 5, 1991, the voters approved the two ballot proposals by a two-to-one margin. The following day, Dr. Gragg, without consulting Stevenson, designated Kemper Capital Markets Securities as the lead underwriter. Shortly thereafter, the board of education adopted a resolution designating Kemper as the lead underwriter for the bond issue. Upon its selection, Kemper's representative, Richard Allen, contacted another Miller Canfield attorney who agreed to represent Kemper in the bond issue. While attorney Stevenson was aware of the conflict of interest, he neither advised plaintiff that defendant also represented Kemper in this transaction nor sought plaintiff's consent to allow the dual representation.

The planning team for the bond issue consisted of Allen and Brian Leflar from Kemper, Stevenson, Erickson, and Ronald Franey, who had replaced Rothrock as plaintiff's chief financial officer on January 1,

---

sis, the interest over the life of the bonds was estimated to be $15.5 million using CIBS and $119 million using CABS.

1991. While Kemper was to prepare the bond structure, Stevenson's role was to advise about the legal aspects of the bond issue. Although plaintiff originally intended to issue approximately $6.5 million in deficit reduction bonds over a ten-year period, Franey and Erickson testified that they decided to compress the repayment period of the deficit reduction bonds to three years and increase the amount from $6.5 to $9.2 million on the basis of Stevenson's advice that plaintiff would receive $1.2 million in additional state aid for every mill that was levied to pay for the deficit reduction pursuant to § 21 of the State School Aid Act, MCL 388.1621; MSA 15.1919(921).[2] According to Franey and Erickson, the decision to repay the $9.2 million in deficit reduction bonds over a three-year period on the basis of the expectation of additional state aid led also to the decision to refund the 1985 school building and site bonds.

The proposed bond structure was presented at the board meeting on February 21, 1991. Before the public meeting, the board held a one-hour study session about the structure of the bond proposal and a closed session to discuss teacher contract negotiations. At the study session, the superintendent and each board member received an informational packet showing that Kemper proposed borrowing a total principal of $58.5 million, predominantly in CABs, which incurred $107 million in interest and $167 million for debt service over the twenty-five-year life of the bonds. Allen discussed the use of CABs with the board, pointing out

---

[2] At the time of the bond issue, § 21 of the State School Aid Act had been amended by 1990 PA 207, effective July 27, 1990. Three months after the bonds were issued, § 21 was amended by 1991 PA 118, effective October 11, 1991.

that CABs were similar to Series E savings bonds issued by the federal government in that interest was deferred until the future and that they cost more than CIBs. At the closed session, Franey informed the board that if plaintiff refunded its 1985 bond issue, it would receive additional state aid of approximately $2.6 million in the first year, and about $7 million to $8 million over a three-year period. There was no discussion about the additional state aid at the public meeting that followed because it was decided that bringing up the additional money "wouldn't serve the best interests of the School District for the future." Stevenson remained silent throughout Franey's presentation. At the public meeting, Allen led the discussion presenting the proposed bond structure to the board, while Stevenson spoke briefly about the legal aspects of the bond issue, fielding several questions from the audience. No alternative bond structures were discussed. According to Allen, only one proposal was made to the board because "that was the only way to go" based on the premise that plaintiff "wanted to get as much done as possible" without exceeding the 2.8-mill limitation. Erickson also acknowledged that the bond structure was presented as the "optimum package" to the board because "[w]e didn't have too many options. The option was not to do it."

Subsequently, at a meeting on March 21, 1991, the board adopted three resolutions authorizing a bond issue not to exceed approximately $54.4 million, which was structured as follows: $9.2 million for deficit reduction; $15.8 million for refunding the 1985 school building and site bond issue; $4.6 million for refunding the 1985 asbestos removal bonds; $5 mil-

lion for textbooks; and $19.8 million for building construction.

Because of plaintiff's low credit rating, the bond insurance company that ultimately insured the bond issue required plaintiff to sell its bonds to the Michigan Municipal Bond Authority (MMBA), which, in turn, issued its own bonds. After submitting an application to the Michigan Department of Treasury with information concerning the bond structure, the MMBA agreed to participate in the sale of plaintiff's bonds.

In early May 1991, plaintiff was informed by an official of the Michigan Department of Education that because there was no site-acquisition language on the February ballot proposal, plaintiff could not use the bond proceeds to buy land for a new bus depot. Although Dr. Gragg's staff recommended that plaintiff ask the voters to approve a ballot proposal at the school board election in June 1991 allowing the previously approved bond proceeds to be used for the acquisition of land for a new bus depot, Dr. Gragg decided not to do so. The board of education concurred in her decision. As a result, plaintiff contracted with a private bus company to supply transportation services, eventually using the bond proceeds intended for the new bus depot for other purposes.

On June 27, 1991, the bond closing occurred. The final bond structure consisted of the following: $9.2 million in deficit reduction bonds with a debt service of $10.402 million; $5 million for textbooks bonds with a debt service of $6.201 million; $4.6 million for refunding asbestos bonds with a debt service of $5.964 million; $19.78 million in CABs for new construction with a debt service of $58.655 million; $15.8

million in CABs for refunding the 1985 school building and site bonds with a debt service of $45.725 million. The total debt service on the approximately $55 million bond issue was $126.947 million.

Subsequently, in February 1992, plaintiff was informed by the Michigan Department of Education that its calculation of additional state aid was incorrect. In the spring of 1992, Dr. Gragg informed the board that plaintiff would not receive $2.6 million in additional state aid as expected and that, as a result, it would finish the 1991-92 school year with a $2 million deficit because it was too late in the fiscal year to make the necessary adjustments.

Plaintiff initiated this legal malpractice action on July 7, 1992. The amended complaint had three counts. In the first count, plaintiff alleged that Stevenson negligently drafted the language of the February ballot proposal by failing to state that plaintiff intended to use bond proceeds to purchase land for a new bus garage. Because the use of the bond proceeds to buy the land required voter approval, plaintiff alleged that it was prevented from buying the land and instead had to privatize its bus operations. Count I will be referred to as the "ballot language" issue.

In the second count, plaintiff alleged that Stevenson provided incorrect legal advice to plaintiff about the amount of additional state aid that plaintiff could expect to receive as a result of issuing deficit reduction bonds and refunding the 1985 school building and site bonds. As a result, plaintiff alleged it was misled into believing that it would receive $7 million to $8 million in extra state aid over a three-year period, including $2.6 million for the 1991-92 school year. The nature of the damages occasioned by this

malpractice were the incurrence of unnecessary costs in interest and issuance fees, and also the loss of general operating revenues. Count II will be referred to as the "state aid" issue.

In the third count, plaintiff alleged that defendant law firm had a conflict of interest in representing plaintiff and the lead underwriter of the bond issue, Kemper Capital Markets Securities. This meant that the board's interests were compromised in its dealings with Kemper. Moreover, defendant's failure to inform board members about the implications of the financial structure of the bonds was a breach of its professional duties. As a result, plaintiff claimed to have suffered damages because plaintiff selected a bond structure that involved excessive interest and issuance costs. Count III will be referred to as the "conflict of interest/attorney-client communication" issue.

After a lengthy trial, the jury returned a unanimous verdict in favor of plaintiff with regard to all three counts. The trial court entered a judgment upon the jury verdict awarding plaintiff $206,757 in present damages but no future damages on count I; $3,391,782 in present damages and $16,879,047 in future damages on count II; and $334,710.40 in present damages and $4,701,221 in future damages on count III.[3] Subsequently, the trial court denied defendant's motion for

---

[3] The future damages for count II discounted to present value were $16,879,047, whereas the future damages for count III amounted to $22,755,573. The jury also found that plaintiff was twenty percent comparatively negligent with respect to count III. Because there was an overlap of $16,879,047 in the future damages claims for counts II and III, the trial court subtracted $16,879,047 from the future damages for count III and then reduced that figure by twenty percent.

judgment notwithstanding the verdict (JNOV), remittitur, or a new trial.

## II

In its direct appeal, defendant first claims that the trial court erred in denying its motion for JNOV with respect to count III because plaintiff failed to show that its legal malpractice proximately caused the damages. We agree.

## A

A motion for JNOV should be granted only when there was insufficient evidence presented to create an issue for the jury. *Wilson v General Motors Corp*, 183 Mich App 21, 36; 454 NW2d 405 (1990). When deciding a motion for JNOV, the trial court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party and determine whether the facts presented preclude judgment for the nonmoving party as a matter of law. If the evidence is such that reasonable people could differ, the question is for the jury and JNOV is improper. *McLemore v Detroit Receiving Hosp*, 196 Mich App 391, 395; 493 NW2d 441 (1992).

In *Charles Reinhart Co v Winiemko*, 444 Mich 579, 585-586; 513 NW2d 773 (1994), a legal malpractice case alleging appellate malpractice, the Court observed:

> A unanimous opinion of this Court recently defined the elements of a legal malpractice action in Michigan:
> "(1) the existence of an attorney-client relationship;
> "(2) negligence in the legal representation of the plaintiff;
> "(3) that the negligence was a proximate cause of an injury; and

"(4) the fact and extent of the injury alleged. [*Coleman v Gurwin*, 443 Mich 59, 63; 503 NW2d 435 (1993).]"

As in other tort actions, the plaintiff has the burden of proving all the elements of the suit to prevail. *Id.*

In *Winiemko, supra* at 586, the Court observed that "[o]ften the most troublesome element of a legal malpractice action is proximate cause," noting:

As in any tort action, to prove proximate cause a plaintiff in a legal malpractice action must establish that the defendant's action was a cause in fact of the claimed injury. [*Id.*]

In a footnote, the Court further observed:

Causation in fact is one aspect of, and distinguishable from, legal or proximate cause. . . . The question of fact as to whether the defendant's conduct was a cause of the plaintiff's injury must be separated from the question as to whether the defendant should be legally responsible for the plaintiff's injury. . . . Legal cause is often stated in terms of foreseeability. [*Id.*, n 13.]

The Court also noted that a jury cannot rely on "speculation and conjecture" in finding a defendant liable. *Id.* at 587.

In *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994), the Court observed that "[a] plaintiff must adequately establish cause in fact in order for legal cause or 'proximate cause' to become a relevant issue." See also *Dedes v Asch*, 446 Mich 99, 106, n 2; 521 NW2d 488 (1994). In *Skinner*, the Court relied upon *Kaminski v Grand Trunk W R Co*, 347 Mich 417, 421-422; 79 NW2d 899 (1956), which adopted the following test of conjecture when there were alternative theories of causation requiring a

"rule of conjectural choice between equally plausible inferences":

> "As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."

> \*     \*     \*

> "If, however, plaintiff has proven sufficient facts to justify a verdict upon *one* theory, the fact that there may be one or more other seemingly rational explanations of the episode in no manner precludes a recovery or invalidates the verdict. These are mere matters of argument to be presented to the jury." [Citations omitted.]

After noting that *Kaminski* "highlighted the basic legal distinction between a reasonable inference and impermissible conjecture with regard to causal proof," the *Skinner* Court stated:

> As *Kaminski* explains, at a minimum, a causation theory must have some basis in established fact. However, a basis in only slight evidence is not enough. Nor is it sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory. Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. [*Skinner, supra* at 164-165.]

The Court also noted that it has consistently applied this standard of factual causation in negligence cases:

> "The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." [*Mulholland (v DEC Int'l Corp*, 432 Mich 395, 416, n 18; 443 NW2d 340 [1989]), quoting Prosser & Keeton, Torts (5th ed), § 41, p 269.] [*Skinner, supra* at 165.]

B

After thoroughly reviewing the record, we conclude that plaintiff failed to present substantial evidence from which a jury could infer that defendant's legal malpractice (i.e., its violation of its professional duty by representing conflicting interests in the bond transaction and its failure to inform the board members sufficiently in order to permit them to make an informed decision about the bond transaction) was a cause in fact of plaintiff's damages. *Id.*

1

In discussing our conclusion, we begin by examining plaintiff's evidence that it suffered damages with respect to count III. At trial, plaintiff presented the expert testimony of John Axe, who proposed an alternative bond structure to support his opinion that plaintiff suffered damages equal to the difference between the future interest costs for the bonds it actually issued and the costs for bonds that it might

have issued. In devising an alternative bond structure, Axe testified:

> Well, I took a look at what they had actually done, and I basically compared that with what I felt a reasonably informed Board of Education might have concluded was something that they could live with under the circumstances, and this is what I came up with.

According to Axe, plaintiff should have taken the unspent portion of the 1985 school building and site bonds, which amounted to $8.7 million, and used that to "partly defease" (i.e., pay off) the future obligations of the old bond issue. He also recommended that plaintiff initially should have borrowed only $6.6 million for new construction in 1991, rather than $19.78 million, as plaintiff actually did, waiting until 1997 to issue $13.18 million in bonds for future construction, predominantly in CIBs. According to Axe:

> Now, the reason for waiting was twofold. Number one, they were having trouble spending the money based on what happened in the past.
>
> Number two, by doing that you were able to issue current interest bonds and stay within what I understand there was a limit. They didn't want to levy any more than 2.8 mills and so, in order to do that, if you delayed that second part of the bond issue until 1997, you would achieve that goal . . . .
>
> The third piece . . . is the undisturbed 1985 bond issue. That still has to be paid off and so . . . that would cost them a total of $12,113,000.

Axe also recommended borrowing only $2.75 million for textbooks:

> I would have recommended to the School District that based upon their, again, experience in spending money that they did not really need to spend $5 million for textbooks.

It was an extraordinarily high number. I took a look, for instance, at the amount of money they spent per pupil for textbooks going back to 1980, and it was a very small number in 1980.

It had gone up dramatically by 1990, it had gotten up to $45 [per pupil] in 1990. The $5 million, based upon the enrollment, would have required them to spend something over $300, I believe, per pupil. A huge number, I mean an increase of a huge amount, and it just seemed to me that based upon, again, their experience in not being able to spend money on construction projects that it might be hard for them to find that many textbooks, and I had a question as to whether it was reasonable for them to do that.

My reasonable scenario would have been to reduce that by what I think would have been a reasonable number and issued 2.75 million in textbooks.

However, on cross-examination, Axe conceded that under his alternative bond structure there would have been $21 million less available to plaintiff in June 1991 for expenditure and that by June 1997 plaintiff would have borrowed $7 million to $8 million less. He also acknowledged that he did not take into account the actual needs of the school district, as expressed to the board of education by the school administrators in support of the ballot resolution, "[b]ecause I don't think it's relevant to what we are talking about." As Axe explained:

Well, it's not quite accurate to say that I did or didn't take anything into account because I didn't look at the document [listing plaintiff's needs for the bond issue]. What I looked at was other factors such as the fact that they had a terrible time expending the money that they borrowed in 1985.

\* \* \*

I reached a conclusion . . . that they had a $9.2 million deficit, that they needed to do something about that and

they had to issue those [deficit reduction] bonds right then or they wouldn't get rid of the deficit, that they apparently had a substantial need for textbooks. I concluded it didn't need all the 5 million at once . . . and I concluded that the capital expenditures for capital purposes could be diminished and that that would be a prudent thing for them to do considering how slowly they had been able to spend the money before, and that's why I arrived at what I arrived at.

\*    \*    \*

I looked at an overall picture and tried to construct what seemed to me to be a reasonable thing that should have been presented to the Board of Education for their consideration.

In determining plaintiff's damages, Axe concluded that the "net damage to the School District is $49,489,000," which was the difference between the actual debt service of $126,947,000 on the bonds as issued and $69,927,000 in debt service on the alternative bond structure, less further adjustments for reduced borrowing on textbooks and partial payoff of the 1985 bonds in the amount of $7,531,000. According to Axe, plaintiff also sustained damages of $418,388 in unnecessary underwriting costs.

2

While it is uncontested on appeal that plaintiff suffered damages, the question before us is whether plaintiff introduced sufficient evidence to show that defendant was a proximate cause of the damages. Simply put, the question is whether plaintiff showed that the members of the board of education would have adopted the alternative bond structure outlined by plaintiff's damages expert had Stevenson proposed it.

To establish proximate causation, plaintiff relies upon various strands of testimony. First, plaintiff cites Axe's testimony in which he opined that public bodies can reasonably be expected to implement bond structures that serve the taxpayer's interests. On direct examination, the following exchange occurred between plaintiff's counsel and Axe:

> Q. Mr. Axe, you indicated in response to my earlier question that you'd formed an opinion on the question of whether the Pontiac School Board of Education would have approved the refunding of the '85 bonds if the Board members had been fully informed. My question is could you explain to the jury on what premise your testimony will be based as to what the Board of Education would have done if properly informed?
>
> A. Well, that's right. I have been doing this for quite a long time now and at least in my personal experience with a lot of public bodies all over the state it's generally been my experience that if you explain to a public body various alternatives, and particularly if you explained to them that one alternative will cost a great deal more than another alternative, that generally—in fact I think almost uniformly, at least in my experience—that they will take what they perceive to be the cheaper route for their taxpayers, particularly when, as you have in this particular instance, a bond issue which is being paid for exclusively by real property taxes in the district.
>
> The people on these public boards, of course, are taxpayers and they're elected by taxpayers and I don't think they would knowingly enter into a transaction which would be terrifically costly to their public corporation if they felt there was a viable alternative and that had been explained to them.

However, when defense counsel objected to the line of questioning because Axe was tendered as a damages expert, the trial court permitted Axe to testify only about the various choices or alternatives that

were available, not what the school board's decision might have been had Stevenson proposed a "viable alternative." Immediately thereafter, the following exchange occurred between plaintiff's counsel and Axe:

> *Q.* Let me put the question to you again. In your experience, is that equally true where a public body is asked to delay accomplishing projects or perhaps reduce or adjust the amount of money that it chooses to borrow in order to accommodate savings significant—achieving significant tax savings?
>
> *A.* Yes, that's true. I have observed that on quite a number of occasions, as a matter of fact.

Plaintiff also cites the testimony of Dr. Gragg, who testified that plaintiff was flexible about the amount to be borrowed and the timing of the issuance of bonds so as to achieve a financially advantageous bond structure. Dr. Gragg further stated that plaintiff had a history of working with Stevenson as bond counsel and Erickson as financial planner and that she primarily relied on Stevenson to guide plaintiff through the bond transaction because he had worked with plaintiff as well as other school districts on previous bond issues. According to Dr. Gragg, they had discussed "multiple years in the future" and that "[t]here was never any intent to try to do everything at once."

Plaintiff also cites the testimony of board members who said that they were unfamiliar with the financial aspects of the bond structure and largely unsophisticated in financial matters and thus relied upon Stevenson and the other financial experts whom plaintiff hired to protect plaintiff's interests. Of the seven board members, five testified at trial. None of them

read the bond materials prepared by Kemper, and all assumed that the professional experts had devised the "optimal" bond structure.

3

Contrary to plaintiff's contention, the testimony of Axe, Dr. Gragg, and the board members was not sufficient to establish that defendant's legal malpractice was a cause in fact of plaintiff's damages. Indeed, there was no testimony that if Stevenson had advised the board to adopt an alternative bond structure that borrowed less money on different terms, then the board would have adopted it. Although plaintiff established on the basis of Axe's testimony that a reasonably informed board of education would have adopted his alternative bond structure, plaintiff failed to elicit any testimony from the board members themselves to the effect that they would have adopted such an alternative bond structure had Stevenson proposed it. Further, while the trial court remarked, in denying defendant's motion for JNOV, that "had Defendant wanted the Board members asked a particular question, it could have asked them those questions itself," defendant rightly points out that the burden was on plaintiff to elicit such proof. *Coleman, supra* at 63. Given that all the proofs indicated that plaintiff wanted to borrow as much as possible, without exceeding the 2.8-mill limitation, it cannot be assumed, without relying upon speculation and conjecture, *Winiemko, supra* at 586, that the board would have adopted an alternative bond structure that would have borrowed $21 million less in June 1991 and $7 million to $8 million less by June 1997.

For that reason, we direct a verdict in defendant's favor with regard to count III.

III

Defendant also claims that the trial court erred in denying its request to give the standard jury instruction for comparative negligence, SJI2d 11.01, for counts I and II. We agree.

A

MCR 2.516(D) provides:

(1) The Standard Jury Instruction Committee appointed by the Supreme Court has the authority to adopt standard jury instructions and to amend or repeal standard jury instructions in effect. . . . A standard civil jury instruction does not have the force and effect of a court rule.

(2) Pertinent portions of the Michigan Standard Jury Instructions (SJI) must be given in each action in which jury instructions are given if

(a) they are applicable,

(b) they accurately state the applicable law, and

(c) they are requested by a party.

In *Duke v American Olean Tile Co*, 155 Mich App 555, 565; 400 NW2d 677 (1986), the Court noted:

Pursuant to GCR 1963, 516.6, now MCR 2.516(D)(2), pertinent portions of the Michigan Standard Jury Instructions shall be given if they are applicable and they accurately state the law. Noncompliance with this rule is not a basis for reversal unless it results in such unfair prejudice to the complaining party that the failure to vacate the jury verdict would be inconsistent with substantial justice.

B

This issue presents a question of first impression. In *Placek v Sterling Heights*, 405 Mich 638, 662; 275 NW2d 511 (1979), the Court adopted the pure form of comparative negligence in this state, which provided that liability for damages in a negligence action be apportioned on the basis of the relative fault of the plaintiff and the defendant. In *Duke, supra* at 565-566, this Court observed:

> When deciding whether an instruction on comparative negligence is appropriate, the question is whether, in viewing the evidence most favorably to the defendant, there is sufficient evidence for the jury to find negligence on the part of the injured plaintiff. . . . Circumstantial evidence and permissible inferences therefrom may constitute sufficient proof of negligence. . . . The trend is to allow all issues, when supported by facts, to go to the jury.

While comparative negligence has been recognized as a defense in certain professional malpractice actions in Michigan,[4] no appellate court in this state has yet recognized comparative negligence as a defense in a legal malpractice action.[5] Nonetheless, courts in other jurisdictions that have addressed the

---

[4] See *Capital Mortgage Corp v Coopers & Lybrand*, 142 Mich App 531; 369 NW2d 922 (1985) (accounting malpractice); *Pietrzyk v Detroit*, 123 Mich App 244; 333 NW2d 236 (1983) (medical malpractice); *Francisco v Manson, Jackson & Kane, Inc*, 145 Mich App 255; 377 NW2d 313 (1985) (architectural malpractice).

[5] But see *Ignotov v Reiter*, 130 Mich App 409; 343 NW2d 574 (1983), aff'd by an equally divided Court 425 Mich 391; 390 NW2d 614 (1986), where the plaintiff was found to be twenty-five percent negligent following a bench trial in a legal malpractice action. In *Ignotov*, this Court set aside the judgment without addressing the issue of comparative negligence. While, by an equally divided Court, the Supreme Court affirmed the decision of this Court, none of the separate opinions discussed the issue of comparative negligence.

issue have found that comparative negligence is available in legal malpractice actions based upon negligence.

In *Pizel v Zuspann*, 247 Kan 54, 70; 795 P2d 42 (1990), modified on other grounds 247 Kan 699; 803 P2d 205 (1990), the Supreme Court of Kansas held that "comparative fault principles apply to a legal malpractice action based upon negligence unless as a matter of law the client had no obligation to act on the client's own behalf." In *Pizel*, a legal malpractice action brought by the potential beneficiaries of an inter vivos trust, the court found that the trial court correctly instructed the jury to compare the fault of the parties because the evidence showed that "the trustees here should have taken steps based upon their knowledge of real estate and the existence of the trust to manage the property that was contained within the trust." *Id.*

In *Becker v Port Dock Four, Inc*, 90 Or App 384, 390; 752 P2d 1235 (1988), the Oregon Court of Appeals, in concluding that the comparative fault defense should be available in legal malpractice actions, noted:

> Legal malpractice is a form of negligence. In other negligence contexts, findings of comparative fault can be based on the plaintiff's failure to take reasonable measures which might have prevented or reduced the injury caused by the defendant's negligence. We discern no convincing reason why that should not be true in this context.

In *Becker*, the plaintiffs sued their attorney for failing to include certain conditions in a deed, depriving them of rights to a valuable easement, a stairway, and parking space. The jury found that the plaintiffs were

seven percent comparatively negligent. On appeal, the plaintiffs argued that they could not be contributorily negligent, as a matter of law, for relying upon their lawyer's erroneous legal advice or for failing to correct his errors, which involved the exercise of professional expertise. In *Becker*, the court disagreed:

> It may well be correct, as plaintiffs suggest, that a client cannot be contributorily negligent, as a matter of law, for relying on a lawyer's erroneous legal advice or for failing to correct errors of the lawyer which involve the exercise of professional expertise. However, contrary to their understanding, the negligent omission alleged against plaintiffs is not of that sort. They failed to read a document before signing it and, as a possible result, neglected to call the lawyer's attention to the fact that he had omitted data which was very much within plaintiffs' knowledge. They were in as good a position as he to know that something was missing.
>
> We therefore reject plaintiffs' contention that, as a matter of law, they cannot be chargeable with negligence for the omissions in the document which they hired defendant to prepare. We also disagree with their argument that their unfamiliarity with the doctrine of merger by deed means, as a matter of law, that their reading the deed could not have resulted in its correction. It is not certain, as a matter of fact, that plaintiffs' understanding of the relative legal effects of the contract and the deed would have caused them to disregard the missing information in the deed, had they discovered it. The jury's estimation of whether and to what extent plaintiffs were at fault could be, and perhaps was, affected by any relationship which it found between their lack of legal knowledge and the likelihood that their reading the deed would have made a difference. However, that was a question for the jury. [*Id.* at 390-391.]

Similarly, in *Pinkham v Burgess*, 933 F2d 1066, 1073 (CA 1, 1991), the First Circuit Court of Appeals found that the trial court properly instructed the jury to consider comparative negligence in a legal mal-

practice suit, ruling that Maine's comparative negligence statute provides no exception for legal malpractice. Observing that its approach was consistent with other jurisdictions, the First Circuit Court of Appeals noted that "[a]ll of the courts that have considered the issue have held that the defense of contributory negligence applies in legal malpractice actions, despite the fiduciary nature of the attorney-client relationship." Likewise, in *Bowen v Arnold*, 380 NW2d 531, 536 (Minn App, 1986), the Minnesota Court of Appeals found that the trial court did not err in giving a comparative negligence instruction in an attorney malpractice case involving a marital dissolution procedure, ruling that the client must use reasonable care to protect the client's own financial interests given the information provided to the client.

We follow these cases and hold that comparative negligence applies in legal malpractice actions based upon negligence. Specifically, we adopt the formulation of the Kansas Supreme Court in *Pizel* and hold that comparative negligence is a defense in a legal malpractice action unless as a matter of law the client had no obligation to act on the client's own behalf.

C

Turning to the instant case, we conclude that the trial court committed error requiring reversal in failing to instruct the jury on comparative negligence with regard to counts I (the ballot language issue) and II (the state aid issue).

1

Viewing the evidence most favorably to defendant, there was sufficient evidence for the jury to find com-

parative negligence on the part of plaintiff with respect to count I. *Duke, supra.* Stevenson testified that Rothrock told him that plaintiff did not intend to purchase land with the proceeds from the bond issue. Stevenson also said that Rothrock, after reviewing a draft of the ballot proposal, did not raise any objection to the omission of language regarding the purchase of land for a bus depot. As in *Becker, supra,* the jury could have found that plaintiff was comparatively negligent on the basis of Rothrock's presumed failure to call to Stevenson's attention the fact that he had omitted language permitting plaintiff to buy land for a new bus depot. See *Legal malpractice: Negligence or fault of client as defense,* 10 ALR5th 828, §§ 11-12, pp 875-885. Contrary to the trial court's opinion, the issue did not involve legal advice on a technical issue. Rather, bond counsel's mistake involved an error of draftsmanship that Rothrock (or plaintiff's board members for that matter) could have noticed and corrected. Here, the fact that Stevenson omitted language in the ballot proposal was "very much within plaintiff's knowledge." Like the *Becker* court, we reject the position that a plaintiff cannot be comparatively negligent, as a matter of law, for an omission in a document that an attorney has been hired to prepare.

In addition, there was evidence showing that once plaintiff's administrators noticed the error, plaintiff failed to take steps to correct the ballot language error by placing the issue on the ballot in June 1991. Contrary to plaintiff's assertion, this evidence is relevant to the issue of comparative negligence as well as the issue of mitigation of damages. As noted in *Becker, supra* at 390, "comparative fault can be based

on the plaintiff's failure to take reasonable measures which might have prevented or reduced the injury caused by the defendant's negligence." The jury should have been instructed to consider whether plaintiff was negligent by failing to return to the voters with an amended ballot proposal requesting authorization to use the previously approved bond proceeds for the purchase of land for a new bus depot.

2

Viewing the evidence most favorably to defendant, the jury also could have found that plaintiff was negligent in calculating the state aid on the basis of Stevenson's legal advice concerning the interpretation of § 21 of the State School Aid Act. Stevenson testified that he was not asked to calculate the state aid and that although he offered to perform the calculation after the board meeting on June 6, 1991, Franey refused his offer. Stevenson further indicated that when Franey showed him two different methods of calculating the state aid, one that yielded over $2 million in increased annual state aid and the other that yielded only between $400,000 and $750,000, he told Franey that the smaller number was correct and that he did not understand how Franey had arrived at the larger number. Stevenson also testified that he never checked the accuracy of the state aid calculations or performed the calculations at any time during the bond issue, but that he only examined the provisions of the State School Aid Act to ensure that he provided the correct legal advice. According to Stevenson, he provided the correct legal advice, but Franey

misapplied his advice in calculating that there would an additional amount in state aid.

Stevenson also stated that he suggested that Franey confirm his calculations of the state aid formula with persons knowledgeable about the subject matter. While Franey discussed the calculation of the state aid formula with the business manager of another school system, who indicated that he did not calculate the formula in the same way, defendant claims that neither Franey nor anyone else from the school district asked Rothrock how to calculate the state aid formula, even though Rothrock was knowledgeable in this area. According to defendant, plaintiff's failure to consult with Rothrock on the issue of state aid compounded its own negligence in replacing Rothrock, who was experienced in bond matters, with Franey, who was inexperienced, as its chief financial officer in the middle of the work on the bond issue. Defendant also claims that plaintiff was negligent because there was no indication that Franey asked Pearl Holforty, then a partner at Plante & Moran in charge of plaintiff's audit and an expert on state aid, to calculate or verify the anticipated state aid. According to Holforty, while the proper application of the state aid formula was not necessarily known by school district officials, "business managers would know usually how to do it."

In light of the evidence, the jury should have been instructed to assess the relative degree of fault of plaintiff and defendant with regard to count II. *Placek*, *supra*. Contrary to plaintiff's contention, the fact that defendant had a complete liability defense if the jury had accepted Stevenson's testimony that he provided correct legal advice on the state aid formula did not

preclude a comparative negligence jury instruction regarding this count. In this regard, we agree with defendant that "[t]here is nothing in the law to suggest that a jury must view evidence of plaintiff's negligence on an all-or-nothing basis." As defendant points out, such a position would abrogate the doctrine of comparative negligence.

3

The trial court's failure to give the requested comparative negligence instruction with regard to counts I and II requires reversal because the jury could have found that plaintiff was comparatively negligent on these counts just as it did on count III. *Duke, supra* at 565. Because the failure to vacate the jury verdict would be inconsistent with substantial justice, we therefore reverse and remand for a new trial on counts I and II.

IV

Defendant also contends that the trial court erred in giving SJI2d 53.03[6] for reducing future damages to present value, arguing that the standard jury instruction was inapplicable and contrary to all the evidence in the case. We again agree.

---

[6] SJI2d 53.03 provides:

If you decide plaintiff will sustain damages in the future, you must reduce that amount to its present cash value. The amount of damages you determine [he/she] will sustain the first year is to be divided by 1.05. The amount of damages you determine [he/she] will sustain the second year is to be divided by 1.10. The amount [he/she] will sustain the third year is to be divided by 1.15. You then continue to use a similar procedure for each additional year you determine [he/she] will sustain damages. The total of your yearly computations is the present cash value of plaintiff's future damages.

A

The issue of the proper method for determining the present value of future damages came up repeatedly throughout this case. Before trial, defendant brought a motion in limine to exclude reliance by plaintiff on SJI2d 53.03 in calculating the present value of the future damages in this case. At a pretrial hearing, the trial court ruled that defendant was allowed to bring in expert witnesses to testify regarding the issue of determining the present value of the future damages and that plaintiff's experts would have to prove their calculation of the present value of the future damages without relying on SJI2d 53.03, because reliance upon SJI2d 53.03 would direct a verdict in favor of plaintiff. Paradoxically, the trial court also ruled that it would give SJI2d 53.03 if the jury found that there were future damages. When plaintiff filed a motion for reconsideration of the trial court's ruling, arguing that the trial court permitted defendant to introduce proofs at variance with SJI2d 53.03, the trial court denied the motion.

Notwithstanding these pretrial rulings, the trial court, over defendant's objection, allowed plaintiff's damages expert, Axe, to state that he used the five percent simple interest rate in reducing the future damages to present value because "that's what I believe the law requires." Nevertheless, in calculating the present value of future damages, Axe acknowledged that one could go into the marketplace and purchase United States government securities that would pay off the amounts due in the future.

Louis Schimmel, plaintiff's expert on the subjects of bond refunding and the marketing of Michigan munic-

ipal bonds, concurred with this methodology for computing the present value of future damages:

> [T]he most common use of present value is if you were to advance refund the bond issue, that is to pay off a bond issue that's outstanding at some future date, say five years from now. You would invest a sum of money today and it would grow to a higher sum of money five years from now. In fact, the exact amount of money that you would need five years from now in order to retire the bond issue. So it's exactly as I was describing before, it's the investment of funds now to produce a larger sum later.

Thus, in determining the present value of $27 million that was alleged to be the future cost of the decision to refund the 1985 bonds, Schimmel testified:

> [I]f you were to invest a sum of money today, a sum less than $27 million could be invested today which would accumulate and compound over the years to come through the year 2015 that would produce $27 million. So that would be a net present value computation that would be valid.

Schimmel testified that this method called defeasance, whereby an issuer buys securities that pay off future obligations, was an "[a]bsolutely valid use of present value and a necessary use of present value [in the bond industry] . . . to retire future requirements."

In addition, defendant's damage expert, Gregory Nelson, a partner at Coopers & Lybrand, an accounting firm, testified that the market rate or the cost of borrowing money was used in making present value calculations. He opined that plaintiff's use of a simple five percent interest rate to calculate the present value calculation was inappropriate because the cost of borrowing the money that plaintiff was paying on the bond issued in June 1991 was "more like seven

percent." According to Nelson, using a lower interest rate in present value analysis "creates a windfall" and the present value of plaintiff's future damages was substantially less than the $22 million calculated by plaintiff if seven percent were used. Nelson also criticized plaintiff's damages analysis because it used simple rather than compound interest, which meant that it did not allow "interest on interest," and the present value of plaintiff's alleged future damages would be substantially less than $22 million if compound interest were used. Although Nelson concluded that there were no future damages, he testified that even assuming that plaintiff's future damages amounted to $49.5 million, those damages could be paid in full by purchasing securities that settled plaintiff's future obligations. Under the present value analysis subscribed to by Schimmel and Axe, Nelson testified that the purchase of $7.8 million in United States government securities at the time of trial would have paid for plaintiff's future damages. In contrast, using a five percent simple interest rate, the present value of $49.5 million was $22,755,573, a difference of approximately $15 million.

Throughout the trial, the trial court, in colloquies with counsel, expressed doubt about its decision to give SJI2d 53.03 if the jury found that there were future damages. In response to defense counsel's argument that SJI2d 53.03 did not apply to this case, the trial court conceded that giving SJI2d 53.03 was "a matter of convenience and nothing more than that" and even wondered whether its initial pretrial ruling about giving SJI2d 53.03 was correct. Notwithstanding these statements and decisions, the trial court, over defendant's objection, prohibited defense counsel

from arguing to the jury during closing argument any method for calculating the present value of future damages other than the method provided by SJI2d 53.03 or to mention that the method testimony of its damage expert showed that an award of $7.8 million could be invested in government securities to satisfy plaintiff's claimed future damages of $49.5 million. The trial court stated that it was bound to give the instruction, even if the court did not agree with it. Subsequently, the trial court awarded plaintiff future damages of $21,138,438, using the five percent simple interest rate set forth in SJI2d 53.03. In its opinion denying defendant's motion for a new trial, remittitur, or JNOV, the trial court ruled that SJI2d 53.03 was applicable because it is the standard jury instruction regarding future damages

B

In ruling that SJI2d 53.03 was applicable, the trial court relied upon *Rivers v Bay City Traction & Electric Co*, 164 Mich 696, 709-710; 128 NW 254 (1910), where the Court observed:

> It is convenience, and convenience only, and an effort to ascertain and apply a rule which can be conveniently applied to the facts and result in substantial right . . . . The rule is simple, and, if it is the true rule for one year, is the true rule for any number of years. . . . There are too many contingencies, in fact, the risk and cost of which neither plaintiff nor the fund should be charged with. By the rule adopted, and which we approve, plaintiff has discounted her demand, allowing defendant interest upon each installment at the rate of 5 per cent. per annum for the period which is anticipated. Whatever the result, it is, in our opinion, the correct result.

Although case law since *Rivers* has approved the simple five percent interest rate for reducing future damages to present value, *Seabury v Detroit United R Co*, 194 Mich 423; 160 NW 570 (1916); *Gardner v Russell*, 211 Mich 647; 179 NW 41 (1920); *Grewe v Mt Clemens General Hosp*, 404 Mich 240; 273 NW2d 429 (1978); *Freeman v Lanning Corp*, 61 Mich App 527; 233 NW2d 68 (1975); *Tiffany v Christman Co*, 93 Mich App 267, 287; 287 NW2d 199 (1979); *Goins v Ford Motor Co*, 131 Mich App 185; 347 NW2d 184 (1983); *Trpcevski v Kelly*, 158 Mich App 148; 404 NW2d 642 (1986); *May v William Beaumont Hosp*, 180 Mich App 728; 448 NW2d 497 (1989); *Howard v Canteen Corp*, 192 Mich App 427; 481 NW2d 718 (1992); *Foehr v Republic Automotive Parts, Inc*, 212 Mich App 663; 538 NW2d 420 (1995), SJI2d 53.03 was not applicable in the instant case because the evidence was undisputed that actual market interest rates that are compounded were used in reducing future damages to present value.

In *Johnson v Corbet*, 423 Mich 304, 326-327; 377 NW2d 713 (1985), the Court observed:

> Merely because the evidence in a case may include the subject matter of an SJI, it does not mean that the court, upon request of counsel, is automatically required to read every SJI which might tangentially touch on the subject matter. The trial court's duty to determine the "applicability," under MCR 2.516, of a requested SJI runs deeper than that and calls for the exercise of discretion. . . . [I]t is for the trial court to determine when the SJI are applicable, not in an abstract or theoretical sense, but in the context of the "personality" of the particular case on trial, and with due regard for the adversaries' theories of the case and of counsel's legitimate desire to structure jury argument around anticipated jury instructions.

Contrary to plaintiff's contention, the instant case is distinguishable from previous cases in which courts have approved the use of the five percent simple interest rate in reducing future damages to present value. In contrast to those cases, where the future damages were subject to inflation, the future damages in this case consisted of fixed-debt obligations that were susceptible of a sum certain determination unaffected by inflation. In this regard, we agree with defendant that SJI2d 53.03 is similar to the standard jury instructions pertaining to statutory mortality tables (SJI2d 53.01 and 53.02) that establish a rebuttable presumption concerning life expectancy. In the instant case, defendant successfully rebutted the presumption for using the five percent simple interest rate because it presented undisputed evidence that the present value of plaintiff's future damages was determined by using actual market rates that are compounded.

Accordingly, we conclude that the trial court erred in giving SJI2d 53.03 because the five percent simple interest rate was not applicable. MCR 2.516(D); *Duke, supra*. The error resulted in unfair prejudice to defendant such that the failure to vacate the jury verdict would be inconsistent with substantial justice. *Id.*

v

Because we are directing a JNOV for defendant regarding count III and reversing and remanding for a new trial regarding counts I and II, we need not consider whether the trial court committed error in interpreting the jury verdict regarding the calculation of the overlapping future damages for counts II and III. We also need not consider whether the trial court

erred in adding language to a supplemental jury instruction regarding agency because the challenged supplemental jury instruction implicated only count III.

## VI

We consider the remaining issues to the extent that they may recur on retrial. First, the trial court did not err in allowing plaintiff to recover damages under count II for lost state aid budgeted for the 1991-92 school year as well as for unnecessary interest costs arising from the refunding of its outstanding 1985 bonds. Contrary to defendant's contention, the separate damage awards for the lost state aid and unnecessary future interest costs were not inconsistent or mutually exclusive. *Detroit v Larned Associates*, 199 Mich App 36; 501 NW2d 189 (1993). Although defendant argues that the damages awarded under count II placed plaintiff in a better position than it would have been in had defendant's legal malpractice not occurred, the evidence indicates that the damages awarded by the jury were separate and distinct. First, the jury awarded $2.8 million in lost state aid because plaintiff budgeted this amount of money in reliance on Stevenson's allegedly incorrect legal advice concerning the interpretation of the State School Aid Act. Because plaintiff belatedly discovered the error, it ended the 1991-92 school year with a deficit. Had defendant provided the correct legal advice, then plaintiff would not have budgeted the extra state aid as revenue in its 1991-92 operating budget. Plaintiff also established that it would not have refunded the outstanding 1985 bonds had Stevenson provided correct legal advice. As a result of Stevenson's allegedly

incorrect interpretation of the State School Aid Act, plaintiff incurred $16.8 million in unnecessary interest costs associated with the refunding of the 1985 bonds. Hence, we agree with the trial court that the two theories of recovery were neither inconsistent nor mutually exclusive.

Finally, plaintiff argues on cross appeal that the trial court erred in refusing to award it prejudgment interest on the future damages component of the jury award from the date of the filing of the complaint. We decline to reach this issue because we have reversed all damages awarded and are remanding for a new trial on two counts. If plaintiff prevails again at retrial, the trial court will have to revisit this issue.[7]

Reversed with regard to all counts and remanded for a new trial only on counts I and II. We do not retain jurisdiction.

---

[7] We do note that *Paulitch v Detroit Edison Co*, 208 Mich App 656, 661-663; 528 NW2d 200 (1995), held that a plaintiff is entitled to prejudgment interest on future damages when the lawsuit does not result from a personal injury. The Michigan Supreme Court granted leave to appeal to determine whether prejudgment interest was properly allowed on future damages. 451 Mich 899 (1996). However, after the parties submitted briefs and oral arguments were presented, the Supreme Court vacated its order granting leave and denied leave to appeal. 453 Mich 967 (1996).