CRAIG v OAKWOOD HOSPITAL

Docket Nos. 206642, 206859, 206951. Submitted October 8, 2001, at Detroit. Decided February 1, 2002, at 9:15 A.M. Leave to appeal sought.

Antonio Craig, a minor afflicted with cerebral palsy and severe mental retardation, by his next friend and mother, Kimberly Craig, brought an action in the Wayne Circuit Court against Oakwood Hospital, Associated Physicians, P.C., Elias G. Gennaoui, M.D., Ajit Kittur, M.D., and Henry Ford Hospital, alleging and seeking damages for medical malpractice relating to the plaintiff's birth. The plaintiff's mother delivered the plaintiff at Oakwood Hospital while attended by Dr. Kittur and Dr. Gennaoui, who were both employed by Associated Physicians, P.C., which has since been dissolved. The plaintiff alleged that Henry Ford Hospital is liable as the successor of Associated Physicians, P.C. The successor liability claim against Henry Ford Hospital was severed from the malpractice claims against the other defendants. A jury returned a verdict and award of damages against the malpractice defendants, except for Dr. Kittur. The court, Carole F. Youngblood, J., conducted a bench trial on the issue of Henry Ford Hospital's successor liability and found it liable. The court entered a judgment consistent with its verdict and the jury's verdict. The defendants who were found liable appealed, and their appeals were consolidated.

The Court of Appeals held:

1. The trial court did not abuse its discretion in admitting the expert testimony of a neurologist offered by the plaintiff and challenged by Oakwood Hospital. In the absence of a showing by Oakwood Hospital that the disputed testimony was based on novel scientific evidence, the trial court, contrary to Oakwood Hospital's contention, was not required to conduct a hearing to determine whether the evidence was generally accepted in the scientific community.

2. The trial court did not err in denying Oakwood Hospital's motion for judgment notwithstanding the verdict, in which the hospital asserted that there was insufficient evidence that the plaintiff's mother received an overdose of Pitocin or suffered severe and prolonged contractions during labor. The evidence presented at

trial regarding appropriate Pitocin dosage and the nature of the contractions was contradictory, thus precluding a grant of Oakwood Hospital's motion.

3. The trial court did not err in denying motions for judgment notwithstanding the verdict brought by Dr. Gennaoui, Associated Physicians, P.C., and Oakwood Hospital. The evidence, when viewed in a light most favorable to the plaintiff as the nonmoving party, does not support these defendants' contention that the plaintiff's expert witnesses provided conflicting testimony regarding causation. Both of the plaintiff's expert witnesses opined that reduced oxygen flow to the plaintiff's brain during his mother's labor, aggravated by the misuse of Pitocin, caused the plaintiff's injury, although one expert indicated that the plaintiff's brain also sustained injury from trauma to his head while in his mother's pelvic rim. Oakwood Hospital's additional arguments in support of its motion for judgment notwithstanding the verdict are without merit. The testimony of the plaintiff's expert witnesses was not contrary to the facts established by eyewitnesses to the labor and delivery. Despite Oakwood Hospital's contention that it could not have breached the standard of care by not having an internal uterine pressure catheter available in light of Dr. Gennaoui's nonuse of the device, expert testimony regarding the standard of practice applicable to teaching hospitals such as Oakwood Hospital with respect to making such a device available created a question of fact for the jury.

4. The defendants were not denied a fair and impartial trial by alleged misconduct by the plaintiff's counsel at trial. Counsel's comments about the plaintiff's race, racial discrimination, and the plaintiff's skin color at birth do not indicate a studied purpose to inflame or prejudice the jury or deflect the jury's attention from the issues involved. Oakwood Hospital's claim—that the suggestion by plaintiff's counsel that medical records had been altered deprived Oakwood Hospital of a fair trial—is without merit. Oakwood Hospital failed to show that counsel's single question during voir dire about alteration of medical records and questions posed to witnesses about alteration of medical records stated anything improper to the jury or made the jury likely to believe that medical records had been altered. The comment by plaintiff's counsel during closing argument that the Food and Drug Administration (FDA) had removed Pitocin from the market did not deprive the defendants of a fair trial. The medical witnesses gave conflicting testimony regarding continued FDA approval of Pitocin. However, any errors relating to counsel's statement about FDA approval of Pitocin

were sufficiently cured by the trial court's instruction to the jury that it should not consider statements by counsel to be evidence.

5. The trial court did not err in denying the defendants' motion for a mistrial based on the trial judge's alleged partiality to the plaintiff. The defendants failed to identify any objective conduct or comments by the trial judge that served to deprive them of a fair trial and, therefore, have not overcome the presumption that the trial judge was impartial.

6. The trial court did not abuse its discretion in admitting into evidence material from medical treatises and textbooks. The material was properly admitted pursuant to MRE 707, which allows the use of a learned treatise for impeachment of an expert witness during cross-examination and for the rehabilitation of the expert during redirect examination on subjects or issues related to the treatise that was used to impeach the witness during cross-examination.

7. The trial court did not abuse its discretion by denying Oakwood Hospital's motion for remittitur of the jury award for future noneconomic damages inasmuch as the award was within the range of the evidence presented and was not the result of prejudice, passion, or sympathy. The trial court did abuse its discretion by denying Oakwood Hospital's motion for remittitur of the jury award for lost earning capacity. The evidence did not support the amount awarded by the jury.

8. Remand is not required with respect to the trial court's award of costs and attorney fees to the plaintiff, or with respect to the reduction of future damages to present value. The trial court conducted a hearing regarding the reasonableness of the attorney fees, and, consistent with the method prescribed by the Supreme Court, the trial court used a simple interest rate to reduce future damages to present value.

9. The trial court did not err in finding that Henry Ford Hospital, as the successor of Associated Physicians, P.C., was vicariously liable under respondeat superior for Dr. Gennaoui's negligence. When Dr. Gennaoui attended the plaintiff's mother during her labor and delivery, Dr. Gennaoui was employed by Associated Physicians, P.C. The shareholders of Associated Physicians, P.C., converted the professional corporation into a business corporation, Associated Physicians Medical Center, Inc. Henry Ford Hospital purchased all the outstanding shares of the business corporation and installed Henry Ford Hospital employees as officers of the business corporation. Additionally, most of the physician shareholders of Associated Physicians, P.C., along with other physicians, created a new professional corporation, APMC, P.C., and entered into a service agree-

ment with Associated Physicians Medical Center, Inc. The clinic maintained the same location, operating under the name Associated Physicians Medical Center in association with Henry Ford Health Care Corporation. The trial court correctly found that the conditions for holding Henry Ford Hospital liable as successor of Associated Physicians, P.C., had been met.

Affirmed in part, reversed in part, and remanded for the entry of an order of remittitur.

COOPER, P.J., concurring in part and dissenting in part, stated that the award for lost earning capacity fell reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation. The trial court's judgment should be affirmed in all respects.

1. EVIDENCE — SCIENTIFIC TESTIMONY.

A court that admits scientific testimony into evidence must ensure that it is relevant and reliable.

2. MOTIONS AND ORDERS — JUDGMENT NOTWITHSTANDING THE VERDICT.

A motion for judgment notwithstanding the verdict should be granted only where there was insufficient evidence presented to create an issue for the jury; the court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party and determine whether the facts presented preclude judgment for the nonmoving party as a matter of law; if reasonable minds could differ regarding the evidence, the question is for the jury and judgment notwithstanding the verdict is improper.

3. NEGLIGENCE — MEDICAL MALPRACTICE — CAUSATION — CIRCUMSTANTIAL PROOF.

Causation, as an element of a medical malpractice claim, may be established with circumstantial evidence; such evidence must enable a jury to reasonably infer that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.

4. TRIAL — JURY TRIAL — ATTORNEY MISCONDUCT.

An attorney's comments at a jury trial usually will not be cause for reversal unless they indicate a deliberate course of conduct aimed at preventing a fair and impartial trial; reversal is required only where the prejudicial statements of an attorney reflect a studied purpose to inflame or prejudice the jury or deflect the jury's attention from the issues involved.

5. COURTS — JURY TRIAL — IMPARTIALITY.

  A trial court's conduct pierces the veil of judicial impartiality where the conduct or comments unduly influence the jury and thereby deprive a party of a fair and impartial trial; a party who challenges a judge on the basis of bias or prejudice must overcome a heavy presumption of judicial impartiality.

6. WITNESSES — IMPEACHMENT — REHABILITATION — LEARNED TREATISES.

  A learned treatise can be used to impeach an expert witness during cross-examination and to rehabilitate that same expert during redirect examination on subjects or issues related to the treatise that was used to impeach that expert during cross-examination (MRE 707).

7. MOTIONS AND ORDERS — REMITTITUR — APPEAL.

  A trial court may grant a defendant's motion for remittitur if the jury verdict is excessive, that is, greater than the highest amount that the evidence will support; an appellate court may not disturb a trial court's decision to deny a motion for remittitur unless it determines that there has been an abuse of discretion (MCR 2.611[E][1]).

8. MOTIONS AND ORDERS — REMITTITUR.

  A trial court, in deciding a motion for remittitur, considers whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact, whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained, and whether the amount actually awarded is comparable to awards within the state and in other jurisdictions (MCR 2.611[E][1]).

*Mark L. Silverman,* for Antonio Craig.

*Saurbier, Paradiso & Davis, P.C.* (by *Scott A. Saurbier*) (*Gross, Nemeth & Silverman, P.L.C.* by *James G. Gross,* of Counsel), for Oakwood Hospital.

*Kitch Drutchas Wagner DeNardis & Valitutti* (by *Susan Healy Zitterman*) and *Kallas & Henk, P.C.* (by *Leonard A. Henk*), for Henry Ford Hospital.

*O'Leary, O'Leary, Jacobs, Mattson, Perry & Mason, P.C.* (by *John P. Jacobs*), for Associated Physicians, P.C., and Elias G. Gennaoui.

Before: COOPER, P.J., and SAWYER and OWENS, JJ.

OWENS, J. We agree with Judge COOPER's opinion in all respects except for portions of section VII. Specifically, we disagree with the rejection of defendant Oakwood Hospital's challenge to the trial court's denial of its motion for remittitur based on the jury's damages award for plaintiff's lost earning capacity. We affirm in part and reverse in part.

Generally, a trial court may grant a defendant's motion for remittitur if the jury verdict is "excessive," that is, greater than the highest amount that the evidence will support. MCR 2.611(E)(1). An appellate court may not disturb a trial court's decision to deny a motion for remittitur unless it determines that there has been an abuse of discretion. *Palenkas v Beaumont Hosp*, 432 Mich 527, 533; 443 NW2d 354 (1989).

Here, the jury awarded plaintiff, who was born in 1980, $52,000 for lost earning capacity for 1998. In addition, to calculate plaintiff's lost earning capacity for each subsequent year through 2041, the jury added three percent to the previous year's figure to account for inflation. Ultimately, as with any future damages award, the trial court reduced plaintiff's lost earning capacity damages award to its present value: $1,992,138.41.

Defendant Oakwood Hospital moved for remittitur, arguing that the lost earning capacity award should have been reduced to a present value of $967,045 because that was the highest amount supported by the evidence. The $967,045 figure was based on the following testimony of plaintiff's expert witness, Dr. Robert Ancell:

> I looked at certain data that's available to us, government
> data. It's national data and it's related to race, sex, and also
> education and from that data I indicated and felt that his
> previous earning capacity was in the area of nineteen thou-
> sand nine hundred and thirty-eight dollars a year [$19,938]
> to approximately twenty-two thousand seven hundred fifty-
> four dollars per year [$22,754].

Dr. Ancell opined that "one could reasonably expect him to have an earning capacity of a high school graduate or maybe a little bit more than a high school graduate, based on the educational achievements of his biological parents."

Dr. Ancell also testified that the 1997 starting salary at automobile manufacturing companies in Michigan was about twenty dollars an hour, or approximately $40,000 a year, plus benefits. Dr. Ancell noted that a high school education has become a minimum requirement for obtaining this employment. On the other hand, Dr. Ancell testified that "not everybody that wants" these manufacturing jobs get them because of the competition. Dr. Ancell's testimony was supplemented by the expert testimony of a certified public accountant, Marvin Weinstein, that national data indicated that the value of a benefits package was approximately 31.4 percent of the compensation. Thus, Weinstein opined that the benefits package on the $40,000 a year manufacturing job suggested by Dr. Ancell, would be worth approximately $12,560 a year. As noted above, the jury awarded plaintiff $52,000 for lost earning capacity for 1998.

In denying defendant Oakwood Hospital's motion for remittitur, the trial court opined as follows:

> There is no evidence this jury was fueled by bias,
> prejudice or passion. These jurors were all working people

and at least one of them was a nurse. They were experienced people who would have a normal understanding of life's problems and blessings.

They sat patiently through a five-week trial which they had been told would only last for two weeks.

The Plaintiff's case took only four or five trial days and the defense spent more than three times that many days putting on their case . . . .

*        *        *

This Court will not upset the carefully considered decision of the jury and because I believe reasonable minds could find Antonio's life and the ability to live that life could have a reasonable value of $20.9 million. It is important to note that the jury was not required to find that Antonio could only have achieved the minimum income level stream projected by Dr. Ancell. The jury was free to find that Antonio would go beyond a high school education, complete college, and have a professional working life where he earned many times more money than that projected by Dr. Ancell. The projections were the minimum amounts, not the maximum amounts.

As noted above, the trial court's denial of the remittitur motion is challenged on appeal.[1]

It should initially be noted that the length of the trial is not relevant to a determination that the jury award was not excessive. In fact, the trial court's observation that the jury had to sit for three more weeks than they were originally told the trial would

---

[1] In addition, defendants Dr. Elias G. Gennaoui and Associated Physicians, P.C., moved for a new trial, contending that only a new trial would do justice because the jury's verdict could not possibly be satisfied. The trial court denied this motion. A new trial may be granted where the damages award is excessive. MCR 2.611(A)(1)(c) and (d). However, a defendant's ability or inability to satisfy a judgment award is not a proper indicator of excessiveness. See *Palenkas, supra* at 531-533. Thus, the trial court did not err in denying these defendants' motion for a new trial.

take, and that it was the defendants who caused the
trial to be so lengthy, would, if anything, give rise to a
concern that the jurors could have become biased
against the defendants for the inconvenience defen-
dants caused them. Further, contrary to the trial
court's suggestion, no evidence was presented indicat-
ing that it was reasonable to conclude that plaintiff
would have completed college or pursued a profes-
sional career.

Moreover, the trial court erroneously characterized
Dr. Ancell's figures as the "minimum" income level
stream. Dr. Ancell's testimony suggested that the
income range he arrived at for plaintiff was based on
national *averages* under the reasonable assumption
that plaintiff would graduate from high school, and
did not correspond to a minimum earning potential.
Indeed, the minimum earning capacity for someone
with a high school education would be $0, if that per-
son were unwilling or unable to find employment, or
perhaps the national minimum wage extrapolated to a
full-time work schedule. Presumably, the national
data cited by Dr. Ancell included high school gradu-
ates who were unemployed and underemployed, as
well as those who aspired, successfully, to obtain
desirable employment in the automobile-manufac-
turing sector.

Regardless, Dr. Ancell's testimony was that, in his
opinion, plaintiff's lost earning capacity was $19,938
to $22,754 dollars a year. He did not testify that it
would be reasonable to assume that plaintiff would
gain employment in the automobile-manufacturing
sector. Instead, Dr. Ancell's testimony indicated that
demand for these jobs exceeds the supply, assuming,
of course, that plaintiff would have even wanted to

pursue this career path. Dr. Ancell's testimony regarding the automobile-manufacturing jobs was, at most, illustrative of what one specific job might pay a high school graduate.[2] In sum, the evidence was insufficient to support a reasonable factual finding that plaintiff's lost earning capacity for 1998 was $52,000.

However, in the instant matter, there was testimony that it was reasonable to conclude that plaintiff would have graduated from high school. In addition, Dr. Ancell's testimony also suggested that plaintiff may have gone "a little bit" beyond high school. Dr. Ancell, however, did not offer any testimony regarding the earning capacity, if any, for this additional education. Nevertheless, the evidence was certainly sufficient to support a finding that plaintiff's lost earning capacity was at the highest end of Dr. Ancell's earning capacity range for high school graduates.

---

[2] Unfortunately, when an individual is injured at birth, it is impossible to reliably predict what career path the individual would have followed "but for" the injury. In contrast, it is relatively straightforward to calculate lost earnings when an individual is already employed in a career. Similarly, when an individual is pursuing a specific career or vocation, it may be reasonable to assume that the individual would complete that career path. Even performance in school may be a reasonable indicator that an injured person would have pursued a college education, but for an injury. In other words, as the date of injury moves toward birth along a continuum between birth and employment in a desired career path, it necessarily becomes more difficult to reasonably estimate lost earning capacity.

Indeed, it is certainly possible that any newborn child will overachieve relative to the child's family history and other objective considerations, but it is also possible that any newborn child will go on to underachieve relative to those same factors. Although it is *possible* that an injured person would have become a highly compensated professional athlete, it is also possible that the injured person would have chosen a career path leading to intangible rewards, rather than a career based solely on financial reward. Ultimately, to conclude that a person injured at birth would have followed any particular career path "but for" the injury is the hallmark of "speculation," and it is well established that a plaintiff may not recover tort damages that are speculative or contingent. *Theisen v Knake*, 236 Mich App 249, 258; 599 NW2d 777 (1999).

Accordingly, the maximum lost earning capacity award actually supported by the evidence for 1998 was $22,750, plus $7,143.50 (31.4 percent, based on Weinstein's testimony) for benefits, or $29,893.50.

Consequently, we conclude that the trial court abused its discretion by concluding that the actual jury award for lost earning capacity was not "excessive" pursuant to MCR 2.611(A) and (E), and by denying defendant Oakwood Hospital's motion for remittitur. We remand for an order remitting plaintiff's lost earning capacity for 1998 to $29,893.50.[3]

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

SAWYER, J., concurred.

COOPER, P.J. *(concurring in part and dissenting in part).* In these consolidated appeals defendants appeal as of right, challenging a jury verdict for plaintiff[1] on his claims of medical malpractice against defendants Associated Physicians, P.C., Elias G. Gennaoui, M.D., and Oakwood Hospital, and defendant Henry Ford Hospital appeals a bench trial verdict for plaintiff on the issue of successor liability.[2] I would

---

[3] The evidence supported the addition of three percent a year to plaintiff's lost earning capacity to account for inflation, subject, ultimately, to a proper reduction to present value.

[1] As used in this opinion, the term "plaintiff" shall refer to minor Antonio Craig.

[2] Plaintiff's sole claim against defendant Henry Ford Hospital involved its liability as the successor of Associated Physicians, P.C. Upon Henry Ford's motion and its agreement not to relitigate the malpractice issues, the trial court severed this claim from plaintiff's malpractice claims against the other defendants. On appeal, Henry Ford now raises several issues relating to the jury trial and verdict in connection with the malpractice claims, in addition to the issues from the bench trial on successor liability. By choosing not to participate in the jury trial of the malpractice

affirm in all respects. I respectfully dissent from the majority opinion on the issue of remittitur of the jury award for plaintiff's lost earning capacity.

Plaintiff was born on July 16, 1980, at Oakwood Hospital. He has cerebral palsy and severe mental retardation. Plaintiff's mother, Kimberly Craig, was attended during her labor by defendants Dr. Ajit Kittur and Dr. Gennaoui. Defendant Associated Physicians, P.C., employed the two doctors.[3]

I

Defendant Oakwood Hospital argues that the trial court abused its discretion in admitting the testimony of Dr. Gabriel, a neurologist and expert witness for plaintiff, because it was not shown to be based on scientifically accepted or reliable evidence. We review for an abuse of discretion the admission or exclusion of expert testimony. *Tobin v Providence Hosp*, 244 Mich App 626, 654; 624 NW2d 548 (2001).

Under the rules of evidence, the trial court is "charged with ensuring that any and all scientific testimony to be admitted [is] not only relevant, but also reliable." *Nelson v American Sterilizer Co (On Remand)*, 223 Mich App 485, 489; 566 NW2d 671 (1997). MRE 702 provides:

> If the court determines that *recognized* scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

claims, Henry Ford has waived review of any issues associated with that trial. Cf. *People v Carter*, 462 Mich 206, 214-216; 612 NW2d 144 (2000).

[3] The jury found that Dr. Kittur was not negligent.

experience, training, or education, may testify thereto in the
form of an opinion or otherwise. [Emphasis added.]

Pursuant to MRE 702, the *Davis-Frye*[4] test limits the
admissibility of *novel* scientific evidence by requiring
the party offering such evidence to demonstrate its
general acceptance in the scientific community.[5]
*Anton v State Farm Mut Automobile Ins Co*, 238
Mich App 673, 678; 607 NW2d 123 (1999). However,
defendant Oakwood Hospital failed to present any
evidence that Dr. Gabriel's testimony was based on
*novel* scientific evidence. Absent novel scientific evi-
dence there is no need for the trial court to conduct a
*Davis-Frye* hearing. Therefore, the trial court did not
abuse its discretion in admitting the disputed
testimony.

II

Defendant Oakwood Hospital next argues that the
trial court erred in denying the defendants' motions

---

[4] *People v Davis*, 343 Mich 348; 72 NW2d 269 (1955); *Frye v United
States*, 54 US App DC 46, 47; 293 F 1013 (1923).

[5] The United States Supreme Court has rejected the *Frye* test of "gen-
eral acceptance within the scientific community," adopting instead a more
relaxed reliability assessment under the Federal Rules of Evidence.
*Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 593-594; 113
S Ct 2786; 125 L Ed 2d 469 (1993). However, this Court is bound to follow
the stricter *Davis-Frye* standard until such time as the standard is modi-
fied by our Supreme Court. *Boyd v W G Wade Shows*, 443 Mich 515, 523;
505 NW2d 544 (1993).

This Court has previously noted that the Legislature enacted MCL
600.2955(1), which went into effect March 28, 1996, "in an apparent effort
to codify the United States Supreme Court's holding in *Daubert* [, *supra* at
579]." *Greathouse v Rhodes*, 242 Mich App 221, 238; 618 NW2d 106 (2000).
"The plain language of the statute establishes the Legislature's intent to
assign the *trial court* the role of determining, pursuant to the *Daubert* cri-
teria, whether proposed scientific opinion is sufficiently reliable for jury
consideration." *Id.* (emphasis in original).

for judgment notwithstanding the verdict (JNOV) because there was insufficient evidence that plaintiff's mother, Kimberly Craig, received an overdose of Pitocin or suffered severe and prolonged contractions during labor. This Court reviews de novo a trial court's decision regarding a motion for JNOV. *Morinelli v Provident Life & Accident Ins Co*, 242 Mich App 255, 260; 617 NW2d 777 (2000). "A motion for JNOV should be granted only when there was insufficient evidence presented to create an issue for the jury." *Pontiac School Dist v Miller, Canfield, Paddock & Stone*, 221 Mich App 602, 612; 563 NW2d 693 (1997). The trial court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party and determine whether the facts presented preclude judgment for the nonmoving party as a matter of law. *Id.* If reasonable minds could differ regarding the evidence, the question is for the jury and JNOV is improper. *Id.*

The eyewitnesses in this case had no independent recollection of the events. Like plaintiff's experts, their testimony was based on their interpretations of the medical records and the strip recordings taken from the external monitor attached to plaintiff's mother. The nurses and doctors who were present at plaintiff's birth also testified regarding the standard of practice that existed in 1980.

We find that the evidence was contradictory, with plaintiff's expert testifying that the record showed that plaintiff's mother received more Pitocin than ordered, and defendants' witnesses testifying that this did not happen. The jury is the sole arbiter of witness credibility. *Franzel v Kerr Mfg Co*, 234 Mich App 600, 622; 600 NW2d 66 (1999). If reasonable jurors could

honestly have reached different conclusions about the evidence, neither the trial court nor this Court may substitute its judgment for that of the jury. *Hunt v Freeman,* 217 Mich App 92, 99; 550 NW2d 817 (1996). Because there were conflicting interpretations of the record at trial, the credibility of the witnesses was a matter for the jury. Moreover, the defense witness Dr. Gennaoui admitted that even a few milliunits of Pitocin a minute could cause uterine contractions so strong that the fetus might be killed. He also acknowledged that the standard of care in 1980 required continuous monitoring during the administration of Pitocin and that there was at least one fifty-minute period when the monitor was not recording. Thus, even without the administration of Pitocin through two bags, the jury could find that the dose of Pitocin acknowledged by defendants could harm the fetus.

After reviewing the record, we find that there was also conflicting evidence regarding the strength and duration of Craig's contractions. Because there was testimony that the monitor strips indicated some severe contractions and fetal distress, as well as testimony that the strips were "reassuring" throughout Craig's labor, the credibility and weight to be given to this testimony was a question for the jury. *Franzel, supra* at 622. The trial court did not err in denying defendants' motions for JNOV on this ground.

III

Defendants Dr. Gennaoui, Associated Physicians, P.C., and Oakwood Hospital argue that the trial court erred in denying their motions for JNOV because the testimony of plaintiff's expert witnesses created a

conflict between competing theories of causation, which was not resolved, and both theories were insufficient to sustain a finding of liability. According to defendants, Dr. Paul Gatewood's theory was that, as a result of prolonged contractions caused by an overdose of Pitocin, hypoxia (loss of oxygen) to the fetus occurred. Dr. Ronald Gabriel's theory was that the prolonged contractions led to head trauma caused by fetal pounding and grinding in the maternal pelvic area.

To prove a medical malpractice claim, the plaintiff must establish the following elements: "(1) the applicable standard of care, (2) breach of that standard, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Weymers v Khera*, 454 Mich 639, 655; 563 NW2d 647 (1997). A plaintiff must plead his theory of medical malpractice with specificity, limiting the proofs in accordance with the theories pleaded. MCR 2.111(B)(1); *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 284; 602 NW2d 854 (1999).

Defendants argue that plaintiff failed to establish the element of causation. To establish causation, a plaintiff must show that without the defendants' actions, the plaintiff's injuries would not have happened. *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994). Circumstantial proof must facilitate reasonable inferences of causation to be acceptable and not amount to mere speculation. *Id.* at 164. In *Skinner*, the Court discussed the legal distinction between a reasonable inference and impermissible conjecture with regard to causal proof.

> "As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but

not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence." [*Id.* at 164, quoting *Kaminski v Grand Trunk W R Co*, 347 Mich 417, 422; 79 NW2d 899 (1956).]

Circumstantial evidence permitting a reasonable inference of causation requires a plaintiff to provide "substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Skinner, supra* at 164-165.

"All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty. Absolute certainty cannot be achieved in proving negligence circumstantially; but such proof may satisfy where the chain of circumstances leads to a conclusion which is more probable than any other hypothesis reflected by the evidence. However, if such evidence lends equal support to inconsistent conclusions or is equally consistent with contradictory hypotheses, negligence is not established." [*Id.* at 166-167, quoting 57A Am Jur 2d, Negligence, § 461, p 442.]

Dr. Gatewood, an obstetrician, testified about two factors that led to a decrease in oxygen to plaintiff during the mother's labor: a prolapsed umbilical cord and multiple hypertonic contractions. He testified that the combination of these two occurrences led to pro-

longed episodes of hypoxia that can affect a baby's nervous system. Additionally, Dr. Gatewood opined that the use of Pitocin in this case was contraindicated because of the evidence of fetal distress. Dr. Gatewood stated that he could not testify that plaintiff was injured because of the hypoxia because this information was within the purview of a neurologist.

Dr. Gabriel, a neurologist, developed his conclusions on the basis of the character and nature of Craig's labor. Specifically, Dr. Gabriel cited the marked decelerations observed on the. fetal monitor and the positioning of plaintiff's head, that the use of Pitocin had elevated the uterine pressures, plaintiff's subsequent development, and the recorded magnetic resonance imaging (MRI) findings. Dr. Gabriel also considered the fact that the genetic, metabolic, and biochemical studies done on plaintiff were all normal and that there was no evidence that plaintiff's condition was degenerative. He testified that plaintiff's condition was caused by a compression of the fetal head through grinding while the head was in the pelvic rim. This led to an injury over the surface of the brain and an elevation in venous pressures on the brain that impeded the flow of blood to the baby's brain. Receiving less blood resulted in small strokes in the watershed or border zone region of the brain. The two mechanisms of plaintiff's injury were a superficial bruising of the brain and a lack of blood flow to the watershed and border zones. Thus, there was both a traumatic component and a vascular component to plaintiff's injury.

Defendants' expert neurologist, Dr. Michael Nigro, testified that he was uncertain about the cause of plaintiff's condition. When he first saw plaintiff in

June 1981, Dr. Nigro provided a diagnosis of "non-progressive encephalopathy" (a nonprogressive brain disorder). Dr. Nigro indicated on the consultation form that the etiology of plaintiff's condition was "unclear" but that he doubted a metabolic, traumatic, or infectious cause and ruled out a congenital anomaly, by which he meant an abnormality or mutation that developed in the first trimester of Craig's pregnancy. Dr. Nigro did not think that plaintiff's condition was caused by trauma because he believed that plaintiff failed to exhibit neonatal depression at birth. When Dr. Nigro saw plaintiff in 1993, he again noted that the etiology of plaintiff's condition was unclear. However, at trial Dr. Nigro testified that he believed plaintiff's condition was not caused by trauma or hypoxia, but that plaintiff had a congenital disorder that developed during the first trimester of pregnancy. This testimony was inconsistent with Dr. Nigro's findings after his June 1981 consultation with plaintiff, where Dr. Nigro discounted the possibility of a congenital anomaly.

Defense expert Dr. Donn, a neonatologist, testified about his belief that plaintiff was injured in utero before his mother went into labor. He did not believe that plaintiff was injured during labor because he opined on the basis of plaintiff's vital signs at birth, his ability to feed, his ability to make urine and stools, and his overall neurological activity, that plaintiff had been a normal newborn.

We view this evidence and all reasonable inferences in the light most favorable to plaintiff as the nonmoving party. Both of plaintiff's experts pointed to an injury during the labor process caused by the inappropriate use of the drug Pitocin. Although Dr. Gate-

wood spoke in terms of hypoxia and Dr. Gabriel spoke in terms of reduced blood flow to the brain, both specialists believed that plaintiff's condition was caused by reduced oxygen to the brain during the labor process. In addition, Dr. Gabriel believed that there was a traumatic component to plaintiff's injury. However, this belief does not negate or contradict Dr. Gatewood's testimony that plaintiff suffered from intermittent periods of reduced oxygen to the brain during his mother's labor.

The impressions of Dr. Nigro, when he saw plaintiff as a patient, do not contradict the testimony of plaintiff's experts, nor do they conform with Dr. Donn's conclusions. Viewing the evidence in the light most favorable to plaintiff, the most consistent theory is that during his mother's labor, plaintiff suffered an intermittent loss of oxygen resulting in his neurological impairment. The proof amounts to "a reasonable likelihood of probability" and goes beyond a mere "possibility." See *Skinner, supra* at 166. The trial court did not err in denying defendants' motions for JNOV on the basis of the testimony of plaintiff's expert witnesses.

Oakwood Hospital also claims that the recorded observations and testimony of the people present at Craig's labor contradict plaintiff's theory of liability, which rests partially on the assumption that Craig sustained uterine contractions of a very high pressure. An expert's opinion is objectionable when it is based on assumptions not in accord with established facts. *Badalamenti, supra* at 286. "This is true where an expert witness' testimony is inconsistent with the testimony of a witness who personally observed an event in question, and the expert is unable to recon-

cile his inconsistent testimony other than by disparaging the witness' power of observation." *Id.* However, in this case the eyewitnesses testified that they had no independent recollection of the pertinent events but were testifying about interpretation of the medical records and monitor strips. Therefore, the testimony of plaintiff's experts was not contrary to facts established by eyewitnesses.

Oakwood Hospital further argues that it was entitled to JNOV with regard to plaintiff's claim that it breached the standard of care by not having an internal uterine pressure catheter available. Specifically, Oakwood points to the fact that Dr. Gennaoui would not have used an internal monitor because he believed that such monitoring was unnecessary. Oakwood argues that plaintiff therefore could not show that any breach of this standard of care by Oakwood was the proximate cause of plaintiff's injury. We disagree. Dr. Gatewood testified that the standard of practice in 1980 required a teaching hospital, such as Oakwood, to have internal uterine pressure catheters and that the continued use of Pitocin without adequate monitoring was a breach of the standard of care. Dr. Gennaoui acknowledged that Oakwood did not have this capability in 1980. Dr. Bernal testified that it was "protocol" at Oakwood in 1980 to use only external monitors during labor. Dr. Gennaoui's testimony does not negate Oakwood's obligation to follow the standard of practice by having internal uterine monitors available. Rather, it creates a question of fact for the jury. Thus, the trial court did not err in denying JNOV on this ground.

IV

Defendants next argue that they were denied a fair trial by the misconduct of plaintiff's counsel in interjecting improper comments about race and racial discrimination at trial, suggesting that defendants had altered the medical records, and falsely asserting during closing argument that the Food and Drug Administration had removed Pitocin from the market.

> When reviewing asserted improper comments by an attorney, we first determine whether the attorney's action was error and, if it was, whether the error requires reversal. An attorney's comments usually will not be cause for reversal unless they indicate a deliberate course of conduct aimed at preventing a fair and impartial trial. Reversal is required only where the prejudicial statements of an attorney reflect a studied purpose to inflame or prejudice a jury or deflect the jury's attention from the issues involved. [*Hunt, supra* at 95 (citations omitted).]

We first examine defendants' arguments that plaintiff's attorney improperly interjected the issue of race into the trial in order to gain the jury's sympathy. The first instance defendants cite happened during the direct examination of plaintiff's economic expert, Dr. Robert C. Ancell. Dr. Ancell testified that, on the basis of the educational background of plaintiff's parents, he expected plaintiff would have had the earning capacity of a high school graduate or someone with slightly more education. Using government data, which was based on race, sex, and education level, Dr. Ancell first estimated plaintiff's lost earning capacity at between $19,938 and $22,754 annually. Plaintiff's counsel asked if Dr. Ancell assumed that plaintiff, who is African American, would not have

been eligible or qualified to work in the automobile industry. When Dr. Ancell replied that he had assumed the average earnings on the basis of plaintiff's race, sex, and expected educational level, plaintiff's counsel asked, "To your knowledge is there discrimination in the big three in employment on race in Michigan in terms of hiring and advancement?" When Dr. Ancell could not answer this question, plaintiff's counsel asked the trial court to take judicial notice of the existence of racial discrimination in terms of hiring practices, which the court refused to do.

While a snide question, we note that this was only one comment in the context of a five-week trial. Moreover, we believe that this reference to race was neither gratuitous nor intended to inflame the jury. We note after a careful review of the lengthy record that despite defendants' objections to the comments made by plaintiff's counsel, there were several instances throughout the course of this trial where defendants took their own factual liberties and made objectionable statements.

Following the above exchange, plaintiff's counsel asked Dr. Ancell if he was familiar with the starting salaries at automobile manufacturers in 1997, and Dr. Ancell replied that the starting salary was around $40,000 plus benefits, excluding overtime, for jobs requiring a high school diploma. Thus, by inquiring whether plaintiff, were he not so severely handicapped, would be eligible for and likely to receive a position in the automobile industry, plaintiff's attorney raised the range of lost income opportunity that the jury was allowed to consider when evaluating plaintiff's damages.

Defendants challenged other comments concerning plaintiff's skin color at birth. However, we find that these were not improper injections of the issue of race into the proceedings because one of the primary facts at issue was the condition of the newborn plaintiff. Defendants' trial position was that the newborn plaintiff was perfectly healthy and, therefore, plaintiff's neurological impairment could not have been caused by problems during labor or delivery. Numerous defense witnesses testified that Oakwood Hospital's records demonstrated that plaintiff was a healthy newborn. Many of these witnesses also testified that all healthy newborns, regardless of their race, have a pinkish color and that skin color was one measure of a newborn's health measured in Apgar scores. Plaintiff's counsel challenged the credibility of these witnesses by attempting to establish that the comment on the nurse's notes, that plaintiff's skin was "black," was a remark concerning the newborn's condition and not a designation of his race. This comment appeared among other indications of the physical condition and health of the newborn. Therefore, counsel's questions and comments were a permissible challenge to the credibility of defense witnesses and not an unnecessary injection of race into the proceedings.

Defendant Oakwood Hospital next argues that it was deprived of a fair trial because of the suggestion by plaintiff's counsel that the medical records had been altered. Oakwood, citing *Belt v Ritter*, 385 Mich 402; 189 NW2d 221 (1971), argues that there was no evidence of alteration of the records and that plaintiff failed to overcome the presumption that any alleged alteration was made at the time of entry.

The first example defendant mentions involves a question posed to the jury during voir dire where plaintiff's counsel asked whether any of the prospective jurors believed that hospitals or doctors would never alter medical records to avoid liability. The function of voir dire is to elicit sufficient information from prospective jurors to enable the trial court and counsel to determine who should be disqualified from service on the basis of an inability to render impartial decisions. *People v Sawyer*, 215 Mich App 183, 186; 545 NW2d 6 (1996). Plaintiff asked only one question during jury voir dire regarding the possible alteration of medical records. The question was reasonably narrow and intended to determine the jurors' potential bias in favor of or against hospitals. Moreover, this was a generalized question and not a statement or testimony suggesting that defendants altered medical records.

Two of the other examples cited by defendant occurred during the examination of Dr. Gatewood. Plaintiff's counsel contended that the records had been copied over several times, were difficult to read, and that defense questions should make clear to the jury that Dr. Gatewood was not present at plaintiff's birth and could only testify from the records. In the examples involving Dr. Bernal and Dr. Donn, plaintiff asked for an explanation of why, if only one nurse took the Apgar scores after plaintiff's birth, there were two different scores in the record. The questions posed by plaintiff's counsel were fair, and both doctors responded that they were unaware of medical records being altered and offered an innocent explanation for the different scores. Defendant has not shown that the plaintiff stated anything improper

before the jury or that the jury was likely to believe that the records had been altered because of these valid inquiries. Plaintiff's condition at birth was at issue and the question of why two sets of Apgar scores appeared in his record was relevant.

Finally, defendants argue they were denied a fair trial because of the comment made by plaintiff's counsel during closing argument that the Food and Drug Administration had removed Pitocin from the market.[6] Specifically, plaintiff's counsel during closing argument indicated, consistent with the testimony of a defense witness, that oxytocin was still on the market, but not Pitocin. Defendants claim that the evidence plainly indicated that Pitocin was currently still used. Further, defendants contend the argument would be improper, pursuant to MRE 407, even if Pitocin had been removed from the market because post-1980 developments would be irrelevant to the proper administration of Pitocin to plaintiff's mother. Plaintiff maintains that the evidence at trial supported counsel's assertion during closing arguments. First, the direct testimony of Dr. Gennaoui implied that Pitocin was still listed in the Physicians' Desk Reference (PDR). Defense expert Dr. Donn also testified that he was familiar with the PDR and agreed that the work was produced annually and contained all the prescription medications that are approved by the FDA for clinical use in this country. Moreover, defense expert Dr. Dombrowski responded affirmatively when asked whether the PDR contained all the prescribed medications that are FDA approved in this country, but

---

[6] Pitocin is one trade name of the generic drug oxytocin.

acknowledged that the current edition contained an entry for oxytocin but not for Pitocin.

We find that the trial court did not abuse its discretion in overruling defendant's objection to plaintiff's counsel's statement during closing argument. While many of the medical witnesses testified that Pitocin was still used to induce labor, some defense witnesses testified that the PDR contained all medications approved by the FDA and acknowledged that there was no entry for Pitocin in the latest edition. Additionally, the trial court instructed the jury that the statements of counsel were not evidence and that the jury should "disregard anything said by an attorney which is not supported by evidence or by your own general knowledge and experience." Such admonitions are sufficient to cure any prejudice arising from counsel's improper remarks. *People v Bahoda*, 448 Mich 261, 281; 531 NW2d 659 (1995).

V

Next, defendants argue that the trial court erred in denying their motion for a mistrial based on the trial court's alleged partiality toward plaintiff. A trial court's conduct pierces the veil of judicial impartiality where the conduct or comments unduly influence the jury and thereby deprive a party of a fair and impartial trial. *People v Paquette*, 214 Mich App 336, 340; 543 NW2d 342 (1995). A "party who challenges a judge on the basis of bias or prejudice must overcome a heavy presumption of judicial impartiality." *Cain v Dep't of Corrections*, 451 Mich 470, 497; 548 NW2d 210 (1996).

After reviewing the record, we find that defendants failed to identify any objective conduct or comments by the trial judge that served to deprive them of a fair trial and, therefore, that defendants have not overcome the presumption of impartiality. The trial judge specifically denied on the record making any inappropriate comments or gestures during the trial. Moreover, in instructing the jury after closing arguments, the trial court specifically admonished the jury, "I have not meant to indicate any opinion as to the facts by rulings, conduct or remarks during trial. But if you think I have, you should disregard it, because you are the sole judges of the facts." Jurors are presumed to follow their instructions absent a showing to the contrary. *People v Mette*, 243 Mich App 318, 330-331; 621 NW2d 713 (2000).

VI

Defendants next argue that they are entitled to a new trial because of plaintiff's improper use of medical treatises and textbooks as substantive evidence. The admission of evidence is within the discretion of the trial court and will not be set aside absent an abuse of discretion. *Chmielewski v Xermac, Inc*, 457 Mich 593, 613-614; 580 NW2d 817 (1998).

MRE 707 states:

> To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of . . . medicine . . . established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only.

While MRE 707 strictly prohibits the use of learned treatises in direct examination of an expert witness, it does not absolutely forbid their use at other stages of a trial or for other reasons. *Hilgendorf v St John Hosp & Medical Center Corp*, 245 Mich App 670, 702; 630 NW2d 356 (2001). A learned treatise can be used to impeach an expert witness during cross-examination and to rehabilitate that same expert during redirect examination on subjects or issues related to the treatise that was used to impeach that expert during cross-examination. *Id.* at 705-706. The key is whether the treatise was used for "impeachment purposes." *Id.*

In *Bivens v Detroit Osteopathic Hosp*, 77 Mich App 478; 258 NW2d 527 (1977), rev'd 403 Mich 820 (1978), a case cited by defendants, the trial court permitted the plaintiff's attorney to read a three-page section of a medical textbook during closing argument. The section was not used during cross-examination for the purpose of impeachment, but was admitted as substantive evidence. This Court found that the trial court exceeded its authority in admitting the material as substantive evidence, but decided the error did not require reversal. *Bivens, supra* at 491-492. Our Supreme Court reversed and stated that "[g]iven counsel's extended references to the textbook during his closing argument, we cannot agree with the Court of Appeals that the effect of this evidence 'was probably minimal.'" *Bivens, supra* at 820-821.

Defendants present several arguments regarding the use of treatises and periodicals by plaintiff's counsel during trial. We note from our review of the record that the use of authoritative texts by all parties

was pervasive throughout the trial. Defendants first contend that the trial court allowed plaintiff to misuse textbooks and other publications as substantive evidence. In particular, Oakwood Hospital argues that textbooks were misused in several instances to establish the standard of care. By way of example, we note Oakwood's complaint that plaintiff's counsel incorrectly used a bulletin from the American College of Obstetrics and Gynecology (ACOG) during the cross-examinations of Dr. Kittur, Dr. Gennaoui, and Dr. Bernal, and incorrectly used the American Medical Association (AMA) Drug Evaluation work during the cross-examination of Dr. Kittur. In each of these examples, the texts were properly used for impeachment purposes under MRE 707. Dr. Kittur and Dr. Gennaoui both indicated that the ACOG bulletins were guidelines or authoritative in the standard of care for the management of labor. Dr. Kittur also agreed that the AMA Drug Evaluations would be a recognized authority on drugs and medications. All three doctors testified on direct examination that the standard of care for the management of labor was adhered to in this case and that the capacity for internal monitoring during the administration of Pitocin was unnecessary to meet the standard of care in 1980. Therefore, the article from the ACOG bulletin, stating that internal monitoring was essential, and the article from the AMA work, suggesting that the use of Pitocin in this labor was not in accordance with the standard of care, were appropriate for the purpose of impeaching their testimony. We note that while plaintiff's experts had not testified to each specific proposition read from the text, in each instance the defense witness had testified in a manner contrary to the material in the texts

(which had been established by expert testimony as being reliable authorities). MRE 707 does not require more.

Other examples cited by defendants are also without merit. For example, Oakwood Hospital challenges an exchange that occurred during the cross-examination of Dr. Gennaoui involving the 1978 and 1987 ACOG bulletins, maintaining that the bulletins were used to establish the standard of care and that the witness was not allowed to answer the question. At trial, plaintiff's counsel asked Dr. Gennaoui whether the later bulletin demonstrated that the members of the ACOG had learned that their initial recommendations regarding the dosage of Pitocin were too high. After an objection, the trial court allowed the question for the purpose of establishing causation but plaintiff's counsel essentially withdrew the question by changing the topic. Plaintiff did not use the 1987 bulletin to establish a standard of care because the question was withdrawn before the witness could answer.

Associated Physicians, P.C., and Dr. Gennaoui further complain that the defense was not allowed to use the same texts to rehabilitate defense witnesses that plaintiff had used on cross-examination. During Oakwood Hospital's recross-examination of Dr. Gennaoui, counsel attempted to use a 1989 version of an ACOG bulletin to show that the standard of care for monitoring proposed in a 1975 bulletin had later been rejected. The court ruled that the 1989 bulletin could not be used to establish the standard of care in 1980. Defense counsel argued that plaintiff's counsel had used the 1975 bulletin during cross-examination and that he should be allowed to use a later edition of the

same publication to show that the earlier statement had been withdrawn. However, a careful review of the record reflects that plaintiff did not use the 1989 ACOG bulletin to impeach Dr. Gennaoui's testimony. Therefore, it was within the trial court's discretion to rule that the 1989 bulletin could not be used by defendants to establish the standard of care in 1980.

We also note defendants' arguments that plaintiff's counsel used evidence from the ACOG bulletins and the Williams text as "direct evidence," that the bulletins "were read to Dr. Bernal at length," and that there were "hours of textual cross-examination" of Dr. Dombrowski. Our thorough review of the record does not support these arguments. In fact, one of defendants Associated Physicians, P.C., and Dr. Gennaoui's alleged incidents of "textual cross-examination" by plaintiff, on page 34 of their appellate brief, was actually conducted by defendant Oakwood Hospital. Further, defendants' contention that Dr. Nigro was impeached on cross-examination by an unauthenticated text is also contrary to the record. In fact, Dr. Nigro had identified Swaiman's Pediatric Neurology as a useful reference that he would recommend to residents. A statement from this text was used to impeach Dr. Nigro's testimony on direct examination that plaintiff's condition was caused by something that happened during the early weeks of his mother's pregnancy. Given the narrow scope of its use, Dr. Nigro's identification of the text was sufficient to establish it as a reliable source for impeachment purposes.

Finally, all defendants point to the closing arguments of plaintiff's counsel. Despite what defendants now claim was an inappropriate use of textual mate-

rial, there was no request before closing arguments for a limiting instruction on the use of impeachment material. Both defense attorneys indicated that they had no objections to the jury instructions as read. The trial court also instructed the jury that the evidence they were to consider consisted of the testimony of witnesses and exhibits offered and received and that the arguments, statements, and remarks of the attorneys were not evidence. These admonitions were sufficient to cure any prejudice arising from the claimed improper remarks by counsel. *Bahoda, supra* at 281. Moreover, unlike *Bivens, supra,* plaintiff did not read from the textbooks during closing argument and the textual material was presented to the jury during cross-examination for the purpose of impeachment. We further note that written statements offered for impeachment purposes can be admitted as substantive evidence to the extent that the witness accepted the statements as true. See *Perry v F Byrd, Inc,* 280 Mich 580, 582; 274 NW 335 (1937); *People v Couch,* 49 Mich App 69, 73-74; 211 NW2d 250 (1973).

We find that the trial court's admission of textual materials for impeachment purposes was proper under MRE 707 and did not constitute an abuse of discretion.

VII

Defendants further argue that the trial court abused its discretion by denying their motions for a new trial or remittitur based on the excessive jury award. A new trial may be granted on the basis of an excessive verdict if the verdict was obtained by improper methods, was the result of sympathy or prejudice, or if it was clearly or grossly inadequate or excessive. MCR

2.611(A)(1)(c) and (d). If the only error in the trial is the excessiveness of the verdict, the trial court may deny a motion for a new trial on condition that the nonmoving party consent to remittitur to the highest amount the evidence will support. MCR 2.611(E)(1). A trial court has discretion to grant a new trial and its decision will not be reversed on appeal absent a clear abuse of that discretion. *Setterington v Pontiac General Hosp*, 223 Mich App 594, 608; 568 NW2d 93 (1997). Likewise, a trial court's decision regarding additur or remittitur is reviewed for an abuse of discretion. *Palenkas v Beaumont Hosp*, 432 Mich 527, 533; 443 NW2d 354 (1989); *Setterington, supra.*

In determining whether remittitur is appropriate, a trial court must decide whether the jury award was supported by the evidence. *Henry v Detroit*, 234 Mich App 405, 415; 594 NW2d 107 (1999). The trial court's inquiry should be limited to objective considerations, such as

> [1] whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; [2] whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; [3] whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. [*Palenkas, supra* at 532-533.]

See also *May v William Beaumont Hosp*, 180 Mich App 728, 751; 448 NW2d 497 (1989). The trial judge is in the best position to determine whether the jury's verdict was motivated by such impermissible considerations as passion, bias, or anger. *Palenkas, supra* at 534.

If the jury award for economic damages falls reasonably within the range of evidence and within the limits of what reasonable minds would deem just compensation, the jury award should not be disturbed. *Frohman v Detroit*, 181 Mich App 400, 415; 450 NW2d 59 (1989). In reappraising damages awards, our Supreme Court has followed a rule of just compensation based on the evidence. *Precopio v Detroit*, 415 Mich 457, 470; 330 NW2d 802 (1982); *May, supra* at 754. The proper factor to be considered in determining lost wages is what the injured person could have earned but for the injury. *Prince v Lott*, 369 Mich 606, 610; 120 NW2d 780 (1963); *May, supra* at 752-753.

With regard to plaintiff's lost earning capacity, this writer's view becomes a dissenting opinion. The majority's judgment on this limited issue is provided in the separate opinion that precedes this detailed opinion.

Defendant's economic expert William King testified that lifetime home care for plaintiff would cost approximately $5,566,347 and lifetime institutional care would cost approximately $6,456,618. The jury's total award for future medical care, treatment, services, and equipment was $5,698,877, well within the range of even defendants' evidence. Regarding lost earning capacity, the jury awarded plaintiff the highest amount the evidence would support, taking the highest salary figure suggested by plaintiff's expert Robert Ancell and adding in the value of benefits and calculating three percent annual inflation as provided by plaintiff's expert economist, Marvin Weinstein. Because the awards for future medical costs and lost earning capacity were within the range of evidence

presented at trial, I believe the trial court did not abuse its discretion in denying the motions for a new trial and remittitur based on these awards. This is the only issue on which the panel differs.

The appropriateness of the jury's verdict for future noneconomic damages is more difficult to determine. Noneconomic losses include past and future disability and disfigurement, shame and mortification, mental pain and anxiety, annoyance, discomfiture, humiliation, denial of social pleasure and enjoyments, and fright and shock. *May, supra* at 759. "[S]ince no trier of fact can value pain and suffering with mathematical certainty, it is appropriate for a reviewing court to look to analogous cases for guidance with respect to noneconomic damages." *Id.* at 754. The awards in the analogous cases must be adjusted for the difference between purchasing power in the year of those judgments and the year of the judgment under consideration. *Id.* at 733.[7]

We agree with the trial court's finding that the jury's verdict was not the result of prejudice, passion, or sympathy. First, although defendants contend that the verdict was inspired by the jury's "racial feelings," not all members of the jury were African Americans and the verdict was unanimous. Further, the jury differentiated among the defendants, finding that Dr. Kittur had not been negligent. In fact, the trial court asked potential jurors during jury selection whether they

---

[7] Defendants Associated Physicians, P.C., and Dr. Gennaoui argue that this Court should consider the actual investment potential of a jury verdict to ascertain whether it is excessive. However, none of the Michigan cases cited by defendants as authority for this argument support this approach. Because defendants failed to provide authority for this argument, it has not been preserved for appeal. *Thomas v McGinnis*, 239 Mich App 636, 649; 609 NW2d 222 (2000).

could set aside any sympathy for plaintiff and base their decision solely on the evidence. The empanelled jurors all made a commitment that they would not be influenced by sympathy.

Moreover, after reviewing the analogous cases presented by Oakwood Hospital and plaintiff, we do not find the award for future noneconomic damages excessive. The jury's award of $11,961,512.47 is within the range of cases presented by plaintiff, $6.05 million to $89.5 million, and is only slightly higher than the largest award of $11.23 million presented by Oakwood.[8] As noted by our Supreme Court in *Precopio, supra* at 471-472, "[a]nalogous cases cannot serve as the dispositive or controlling criterion for evaluating an award for pain and suffering, but rather as one factor which may provide some sense of a reasonable range of awards. An appellate court reviewing a personal-injury award should decide each case by its own facts." In the instant case, plaintiff suffers from spastic quadriplegic cerebral palsy with severe mental retardation. Plaintiff is fed from a feeding tube, is incontinent, cannot speak, and requires constant care and supervision. As such, we find no reason to second-guess the jury's decision and believe that the trial court acted within its discretion.

We further find that defendants Dr. Gennaoui and Associated Physicians, P.C., have provided no support for their argument that a new trial is the only appropriate remedy given the "excessiveness" of the damages and the fact that even a remittitur would bankrupt Dr. Gennaoui. We also note that the defendants, who spent much time complaining of plaintiff's inap-

---

[8] The damages awards have been converted to 1996 dollars.

propriate arguments, seek to invoke the sympathy of
this Court in raising the issue of bankruptcy. This is
an inappropriate argument and certainly not pertinent
to the issue of remittitur. Because we find the dam-
ages awarded to be appropriate, there is no need to
provide a new trial. We further note that a new trial is
unwarranted under MCR 2.611(A) because there is no
evidence that the verdict was influenced by passion
or prejudice or that it was grossly excessive. MCR
2.611(A) is not mandatory, and the trial court, pursu-
ant to MCR 2.611(E) may choose remittitur if it finds
that the only error is the excessiveness of the verdict.

VIII

Defendants next cite several alleged miscellaneous
errors that they contend require a remand. Defen-
dants Associated Physicians, P.C., and Dr. Gennaoui
argue that a remand is necessary because no hearing
was held before the award of costs and attorney fees
to plaintiff. Where the party opposing the taxation of
costs challenges the reasonableness of the fee
requested, the trial court should inquire into the ser-
vices actually rendered. *Miller v Meijer, Inc*, 219 Mich
App 476, 479; 556 NW2d 890 (1996). " 'Although a full-
blown trial is not necessary, an evidentiary hearing
regarding the reasonableness of the fee request is.' "
*Id.*, quoting *Wilson v General Motors Corp*, 183 Mich
App 21, 42-43; 454 NW2d 405 (1990). The trial court is
required to make factual findings with regard to attor-
ney fees. *Miller, supra* at 480.

Despite the trial court's statements on July 10,
1997, and in its written opinion, that it was not
required to hold a hearing on costs and attorney fees
but could simply determine a reasonable attorney fee,

the record reflects that an evidentiary proceeding was in fact held on August 8, 1997. At this hearing plaintiff's counsel was examined under oath by defense counsel. Moreover, the trial court's opinion reflects the court's findings of fact in response to the arguments of all parties. Defendants' argument on this issue is meritless.

Defendants all argue that the trial court erroneously reduced future damages to present value using a simple rate of interest. However, our Supreme Court recently held, in *Nation v W D E Electric Co*, 454 Mich 489, 498-499; 563 NW2d 233 (1997), that reduction should be computed using the simple interest rate. See also *Lagalo v Allied Corp (On Remand)*, 233 Mich App 514, 521; 592 NW2d 786 (1999). Therefore, the trial court did not err in using the simple interest method.

IX

Defendant Henry Ford Hospital argues that the trial court erred in finding it liable as the successor of Associated Physicians, P.C. "This Court reviews equitable actions under a de novo standard. We review for clear error the findings of fact supporting the decision." *Webb v Smith (After Second Remand)*, 224 Mich App 203, 210; 568 NW2d 378 (1997); see also MCR 2.613(C).

Plaintiff's complaint alleged that at the time of plaintiff's birth, Dr. Gennaoui was the employee or agent of Associated Physicians, P.C., which was vicariously liable through respondeat superior for his negligence. Plaintiff also claimed that Associated Physicians, P.C., no longer existed and, through merger,

was now known as Henry Ford Hospital and Henry Ford Health System. Through the doctrines of successor liability and respondeat superior, plaintiff alleged that Henry Ford Hospital and Henry Ford Health System were responsible for the actions of Dr. Gennaoui at the time of his birth.

Associated Physicians, P.C., was the employer of Dr. Gennaoui when plaintiff was born. In 1986, the shareholders of Associated Physicians, P.C., converted that professional corporation into a business corporation, Associated Physicians Medical Center, Inc. Henry Ford purchased all the outstanding shares in the new business corporation and on that date employees of Henry Ford became the officers of the business corporation. Additionally, most of the physician shareholders of Associated Physicians, P.C., along with other physicians, created a new professional corporation, APMC, P.C., and entered into a service agreement with Associated Physicians Medical Center, Inc. The clinic maintained the same location, operating under the name Associated Physicians Medical Center in association with Henry Ford Health Care Corporation. Relying on *Turner v Bituminous Casualty Co*, 397 Mich 406; 244 NW2d 873 (1976), the trial court found that the conditions for holding a successor corporation liable had been met.

In *Turner*, the Supreme Court stated that it was the law in this state "that if two corporations merge, the obligations of each become the obligations of the resulting corporation." *Id.* at 419-420. This is also true if the transaction is deemed to be a de facto merger. *Id.* at 420. The *Turner* Court found a continuation of corporate responsibility because:

1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations, and even the [corporate] name.

2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.

3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.

4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation. [*Id.* at 430.]

More recently, in *Foster v Cone-Blanchard Machine Co*, 460 Mich 696, 702; 597 NW2d 506 (1999), the Supreme Court noted that "[i]f the acquisition is accomplished by merger, with shares of stock serving as consideration, the successor generally assumes all its predecessor's liabilities."

On appeal, defendant Henry Ford presents three separate arguments in support of its position that the trial court erred in imposing successor liability. First, Henry Ford contends that the doctrine of successor liability should not be extended beyond the products liability area. Despite defendant's contention, the courts of this state have recognized the doctrine in other contexts. As acknowledged by this Court in *Antiphon, Inc v LEP Transport, Inc*, 183 Mich App 377, 382; 454 NW2d 222 (1990), a case involving allegations of breach of contract, interference with an advantageous economic and business relationship, and unjust enrichment:

Rarely are the appellate courts of this state provided with an opportunity to explore and consider the parameters of

the doctrine of corporate successor liability. To date, in Michigan, the doctrine has been examined only in the context of a common-law tort action, *Chase v Michigan Telephone Co*, 121 Mich 631; 80 NW 717 (1899), *Denolf v Frank L Jursik Co*, 54 Mich App 584, 589; 221 NW2d 458 (1974), [mod] on other grounds 395 Mich 661; 238 NW2d 1 (1976), a products liability action, *Turner*[, *supra*], and an employment discrimination action, *Stevens v McLouth Steel Products Corp*, 433 Mich 365; 446 NW2d 95 (1989). Accordingly, the action before us presents an opportunity to examine the doctrine in a different context.

The Court in *Antiphon* found that the successor corporation could be liable for the debts of its predecessor. *Antiphon*, *supra* at 382. In both *Chase* and *Denolf*, cited in *Antiphon*, the courts declined to find the successor company liable, not as a matter of law or public policy, but on the basis of the facts of the cases. In *Stevens*, the Supreme Court declined to apply successor liability in the employment discrimination context where the successor corporation had no notice of the discrimination claim at the time of the acquisition. Therefore, while the doctrine of successor liability was developed in the products liability arena, the courts have found it applicable in other areas. The fact that Michigan courts have never specifically addressed the issue of successor liability for personal professional services does not preclude or impede its application in the instant case.

Defendant Henry Ford further contends that successor liability should not be applied in this case because it was unaware of plaintiff's claim when it purchased the shares of Associated Physicians Medical Center, Inc., in 1986. Defendant Henry Ford also suggests that plaintiff has an adequate legal remedy against Dr. Gennaoui, Associated Physicians, P.C., and

Oakwood Hospital. Plaintiff asserts that Henry Ford had notice because two attorneys requested plaintiff's medical records in 1983 and 1985. We find that these letters, while not clearly delineating the present suit, provided notice of the possibility of litigation in connection with plaintiff's medical treatment. Furthermore, because Oakwood's liability is separate from Dr. Gennaoui's liability (who was not an Oakwood employee), and Associated Physicians, P.C., ceased to exist in 1986, plaintiff would not have any entity to hold responsible for his injuries under the theory of respondeat superior and would be without an adequate legal remedy.

Defendant next argues that, even if the doctrine of successor liability should be applied in a medical malpractice case, plaintiff failed to establish that the business corporation, Associated Physicians Medical Center, Inc., was the successor of Associated Physicians, P.C. Rather, defendant asserts that the professional medical corporation, APMC, P.C., carried on the medical practice of Associated Physicians, P.C., and is therefore its logical successor.

The trial court did not err in finding that Associated Physicians Medical Center, Inc., was the successor of Associated Physicians, P.C. The amended and restated Articles of Incorporation of Associated Physicians, P.C., state that "the Corporation is hereby converted from a for-profit professional service corporation to a for-profit business corporation . . . ." These amended articles also provided that Associated Physicians Medical Centers, Inc., would be the new name of Associated Physicians, P.C. Associated Physicians Medical Centers, Inc., retained the corporate identification number of Associated Physicians, P.C. The

address of the registered office was changed to 2799
West Grand Boulevard, Detroit, Michigan, which is
the same registered office for the new professional
corporation, APMC, P.C. As the trial court found, it is
undisputed that the medical facilities continued to
operate at the Taylor location exactly as they had
previously.

Further, the basic requirements for imposing liability on a successor corporation stated in *Turner* have
been met. The enterprise of Associated Physicians,
P.C., carried on, with most of the same physicians and
in the same physical location. The professional corporation that was Dr. Gennaoui's employer at the time
of plaintiff's birth, Associated Physicians, P.C., ceased
to exist, having changed its name and its purpose.
Additionally, the new professional corporation,
APMC, P.C., is not the same corporation as Associated Physicians, P.C., having taken on additional physician shareholders and no longer owning the physical location at which it operates or being responsible
for the management of the clinic. Rather, it was Associated Physicians Medical Center, Inc., which was
wholly owned by Henry Ford Health System, that
continued the business operations of the former Associated Physicians, P.C. Associated Physicians Medical
Center, Inc., dissolved in 1993.

The dissolution of this corporation leads to defendant's final argument against imposing successor liability. Defendant maintains that, even if Associated
Physicians Medical Center, Inc., was the successor of
Associated Physicians, P.C., plaintiff presented no evidence that would justify holding Henry Ford Health
System liable as the parent corporation/shareholder
of Associated Physicians Medical Center, Inc. Plaintiff

argued at the bench trial that a de facto merger of Associated Physicians Medical Center, Inc., and Henry Ford Health System occurred at dissolution. As previously stated, when two corporations merge, the obligations of each become the obligations of the resulting corporation despite the fact that the transaction was deemed de facto. *Turner, supra* at 419-420. A transaction is considered a de facto merger if:

> "(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.
>
> "(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
>
> "(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
>
> "(4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." [*Id.*, quoting *Shannon v Samuel Langston Co*, 379 F Supp 797, 801 (WD Mich, 1974).]

It is undisputed in this case that Associated Physicians Medical Center, Inc., ceased business operations and dissolved. There was no sale, per se, because Henry Ford Health System was the parent corporation of the dissolving corporation and caused the dissolution. Moreover, Henry Ford Health System continued to operate a medical clinic at the site of the former Associated Physicians, P.C., which was the same site operated by Associated Physicians Medical

Center, Inc. Thus, we find that a de facto merger occurred and that Henry Ford Health System assumed the liabilities and obligations of Associated Physicians Medical Center, Inc., after its dissolution. The trial court did not err in imposing successor liability on defendant Henry Ford Health System.

I would affirm in all respects.